In the matter of JOSEPH B. BREIDT and JACOB LUBETKIN, solicitors of the court of chancery of New Jersey.

[Decided April 29th, 1915.]

1. Proceedings to discipline a solicitor are civil and not criminal; and the purpose is not to punish the respondent but to purify the bar and protect the court and the public from the fraud and imposition of reckless or unscrupulous lawyers.

2. Conviction of crime of, or evidence that one has been committed by, or such intentional fraud upon the court or a client as shows evidence of moral turpitude in, a solicitor, will justify, but does not necessarily require, permanent disbarment in every case. For less offences a solicitor will be properly punished by temporary suspension from practice.

3. As the supposititious affidavits imposed upon the court by the respondents were true in their statement of facts, and there being no attempted fraud upon clients, and no harm being done by the use made of the papers, the protection of the court and public does not require the permanent disbarment of the perpetrators of the fraud.

4. The respondents, Lubetkin, with reckless zeal for clients' interests, and Breidt, in overweening friendship for Lubetkin, lent themselves to the perpetration of a fraud, harmless in its consequences. This view of the situation—the mildest view possible—saves them from the severest penalty, and Lubetkin will be suspended from practicing for three years and Breidt for two years.

5. The youth and inexperience of solicitors do not extenuate acts inconsistent with common honesty; and the imposition of supposititious affidavits upon a court of justice falls within that category.

On order to show cause why the respondents should not be disbarred or otherwise disciplined and punished.

*Mr. Nelson B. Gaskill,* for the prosecution.

*Mr. Frank E. Bradner,* for the respondent Lubetkin.

*Messrs. Howe & Davis,* for the respondent Breidt:

WALKER, CHANCELLOR.

Jacob Lubetkin and Joseph B. Breidt, solicitors of this court, were ordered to show cause why they should not be adjudged

guilty of malpractice, and why, on account of such malpractice, they should not be disbarred or otherwise disciplined and punished. They each filed an affidavit, admitting the facts recited in the order, on which the charge of misconduct is based, disclaiming any intentional wrong-doing and apologizing to the court. They appeared by counsel and were heard in open court.

The facts are these: The respondent Lubetkin presented a bill of complaint to Vice-Chancellor Howell alleging insolvency of a corporation and praying for the appointment of a receiver. Annexed to the bill, and supporting the facts therein alleged, were three affidavits purporting to have been sworn to before the respondent Joseph B. Breidt, as an attorney-at-law of this state. Vice-Chancellor Howell granted an order to show cause why a receiver should not be appointed, with an *ad interim* stay, returnable at Trenton, and on the return day a receiver was appointed by Vice-Chancellor Backes.

The principal affidavit annexed to the bill, made by William L. Greenbaum, was actually sworn to before Breidt. A corroborating affidavit bearing the signature of Greenbaum, and seven other supposed affiants, was certified by Breidt as having been sworn to before him. A third affidavit, signed by one of these same affiants, is similarly certified. None of these affiants, except Greenbaum, appeared before Breidt and made oath as attested by the jurat. This dereliction was discovered in this wise: On the return of the order to show cause counsel for the defendant company appeared before Vice-Chancellor Backes and presented *inter alia* an affidavit made by one of the supposed affiants to the bill, in which he deposed that he did not make the affidavit; that Breidt was not present at the signing of the paper; that he did not see Breidt either at, before or after the paper was signed, and was certain that Breidt did not take the affidavits of two of the other supposed affiants. Vice-Chancellor Backes reports to me that Lubetkin, called on by him for an explanation, admitted that Breidt had not sworn all of the supposed affiants; that he seemed to be entirely unembarrassed and absolutely unimpressed with the notion that he had done wrong, stating that he understood other lawyers in Newark had done, or were doing, the same thing, obviously intending to excuse

himself upon the ground that he had merely followed an established practice—a practice unheard of and quite astonishing to the vice-chancellor. It is significant that Lubetkin, after taking counsel, did not reiterate this indefensible explanation of his conduct when called on to respond to the pending rule.

Breidt's explanation is, that Lubetkin, who was an office associate, but not professionally related, came to him with Greenbaum and asked that he take the latter's affidavit, and also that he subscribe the jurats to the other affidavits, stating that he (Lubetkin) had seen the other persons sign and had sworn them, and that, being the solicitor in the matter, he could not sign the jurats, and that the matters contained in the affidavits to his own knowledge were true, and to oblige Lubetkin, and without giving the matter any further thought, he took the papers, administered the oath to Greenbaum, and then signed his name to the jurats, and handed the papers back to Lubetkin. Lubetkin admits that he did not see three of the affiants, but as to the others he says he took their affidavits, and later discovering that as solicitor in the cause it would be irregular to subscribe the jurats, asked Breidt to do so, stating to him that he had actually seen four of the affiants sign and that he took their affidavits, and that Greenbaum told Breidt that he (Greenbaum) had seen the other three affiants sign, and had explained the contents of the bill of complaint and affidavits to them, and had told them the nature of the paper they were signing, and that thereupon Breidt swore Greenbaum and affixed his signature to the three jurats.

The discrepancy between Breidt's and Lubetkin's statements, as to whether in fact Lubetkin had told Breidt that he had sworn all of the affiants, if resolved in Breidt's favor, simply aggravates the situation as between them, but in nowise ameliorates the culpability of either.

Lubetkin further states that it did not occur to him that there was any illegality or impropriety in what was being done, and he thought that all the parties having assented to the affidavit, and having actually heard four of them swear to it, and Greenbaum being willing to make an affidavit that the other three had signed it and assented to it, the proceeding was all

right. He adds that he has had no experience in chancery proceedings, nor in the taking of affidavits; that he never read the statute in relation to oaths, had made no study of the subject, and he did not think that any of the questions in the bar examination covered the subject at all. This excuse is too attenuated for serious consideration.

It is difficult to treat seriously the suggestion that either of these respondents may be excused upon the ground that he was not instructed by bar examination questions covering the subject of the administration of an oath. Would they have this question asked: "May an oath be administered to a person not present, and, if so, how?" Or this one: "May an officer, authorized to administer oaths, certify over his signature that a person purporting to make an affidavit, swore to and subscribed the same before him, when, in fact, he did neither, and, if so, why?" These suppositive questions have only to be stated to see the absurdity of any questions at a bar examination of matters which palpably speak for themselves.

Each of these respondents knew—must have known—from the very language of the jurat, that it was required that the affiant appear in person and be sworn before the officer administering the oath; else how could he have administered it? Breidt must have known that his participation in this matter tended to effect, and Lubetkin must have realized that in what he was doing he was perpetrating a palpable fraud upon the court. Both are guilty, the degrees of their guilt varying slightly. Breidt permitted himself to be imposed upon by his friend, as he says, to convenience him. Lubetkin's plea, that his sense of propriety and of duty, as a solicitor of this court, was not sufficiently keen to enable him to appreciate the wrongfulness of his act, is difficult to believe.

The defence of these young men, it will be seen, is confession and avoidance; the avoidance, however, not constituting a defence. These respondents were taught, and may remember, that it is a well-settled and fundamental principle that ignorance of the law excuses no man; and yet they urge, and urge only, an alleged ignorance of the law and practice relating to the administration of oaths and the certification thereof by way of a jurat.

The Oaths act (*Comp. Stat. p. 3773 § 30*) provides: "All oaths, affirmations and affidavits  *  *  *  may be made and taken by and before any one of the following officers of this state, viz.," &c. Section 30a, an amendment of 1905, provides that such oaths, affirmations and affidavits "may be made and taken by and before any attorney-at-law." Lubetkin, as already stated, says that he never read the Oaths act, and did not think that any of the questions in the bar examination covered the subject. Probably, it has never occurred to the bar examiners to ask any question concerning the administration of an oath and its certification, because that which has to be done in that regard is so plain and easily understood that many officers, who may not be lawyers, such as mayors, recorders, aldermen, city clerks, commissioners of deeds and notaries public, who, doubtless, never read the statute of oaths, are empowered to administer and certify oaths and affirmations. The language of a jurat is alone sufficient to convey to any intelligent mind exactly what has to be done in the way of administering and certifying an oath. It says "sworn to and subscribed before me," &c. That means one, and only one, thing, namely, that the person making the oath was before—that is, was in the presence of the official who administered it. I do not say that an affiant may not sign his affidavit out of the presence of the officer taking it, and, before swearing to it, acknowledge the signature to be his. But there is no way in the law whereby an officer authorized to take an oath may certify that he has done such an act when in fact he has not, and in the nature of things there can be no such a proceeding as the absent administration of an oath or the administration of an absent oath. The thing is perfectly incongruous and impossible. The administration of an oath means something or nothing. It cannot be distorted; there is no room for construction, and for a violation of the law in this regard there can be no excuse.

In *Bouv. L. Dic.* (*Rawle's Rev.*) *111,* an affidavit is defined to be "a statement or declaration reduced to writing, and sworn or affirmed to before some officer who has authority to administer an oath or affirmation."

Let us see, now, what an oath is, the thing which vitalized an affidavit. Blackstone, speaking of the foundation of judicial oaths, says (*4 Bl. Com. 43*) they "call God to witness the truth of those facts, which perhaps may be only known to him and the party attesting."

The essence of an oath is thus stated in *29 Cyc. 1298*:

"The essential requisite of an oath at common law is belief by the witness or affiant in the existence of a God, who will punish him if he swears falsely, and an appeal to such God as the rewarder of truth and the avenger of falsehood. But the belief need not be, inevitably, that of the religion of the Bible, and the oath of any person who holds this essential belief, whatever his sect or creed, is sufficient."

Now, the solemnity of an oath is known of all men; as children we learn of it. And all know, lawyers and laymen alike, that papers purporting to be affidavits—that is to say, written evidence that oaths have been taken, when in point of fact no oaths have been administered, are spurious and supposititious. Breidt and Lubetkin knew this. They knew it upon the testimony of their own senses, entirely dissociated from any legal knowledge or training. In imposing these false papers upon the court they did an act from which sensitive and conscientious men would have recoiled.

It is not an answer to say that the statements contained in these supposititious affidavits are true. The power of the court cannot be invoked by the mere off-hand statements of individuals. It acts only upon oaths and affirmations, for the falsity of which in any material respect the deponent may be punished upon indictment and conviction for perjury. And that leads to the observation that if perjury were assigned upon these affidavits, certainly no conviction could be had upon three of them, because the facts asserted in the papers were not sworn to at all; and this because lawyers—officers of the court—had put the matter in such an outrageous posture.

These men are young lawyers, and make much of that fact, Breidt having been admitted as an attorney and solicitor in June, 1912, and Lubetkin in February, 1914. But this is a disingenuous excuse. The courts have dealt with and scouted it repeatedly in this very class of cases.

In *People* v. *Macauley, 230 Ill. 208*, it was held in a disbarment case that youth and inexperience do not extenuate acts inconsistent with common honesty, and the youth and inexperience of an attorney did not extenuate the offence of a fraudulent conspiracy to extort money which is inconsistent with the common honesty which should be the attribute of every attorney licensed to practice law.

In *People* v. *Waldron, 28 Colo. 249*, the court said that the respondent by way of extenuation or modification pleaded youth and inexperience, having been admitted to the bar only a few weeks, and was twenty-three years of age; further, that for some purposes such considerations might have some weight, but not in disbarment proceedings; further, that a lawyer should be actuated by the most delicate sense of honor, and in his dealings with his clients his professional obligations should be scrupulously observed; that even an inexperienced person, at the time of admission as a member of the legal profession, ought to know that it is wrong to appropriate to his own use money belonging to others.

*In the Matter of Shapiro, 144 N. Y. App. Div. 1*, an attorney-at-law was disbarred for making an agreement with a prospective witness to pay him a material proportion of the recovery, if he would testify in a certain action. It appears (at *p. 3*) that the respondent (Shapiro) set up inexperience, among other things, as a defence. The court does not appear to have even noticed the claim of inexperience, and disbarred the attorney.

The sanctity of an oath may perhaps best be understood when we consider the detestation in which a corrupt—that is to say, false, oath is regarded by the law. Blackstone says (*4 Bl. Com. 137*) that perjury is defined by Sir Edward Coke

"to be a crime committed when a lawful oath is administered, in some *judicial* proceeding, to a person who swears *wilfully*, absolutely, and falsely, in a matter *material* to the issue or point in question."

And he adds:

"The law takes no notice of any perjury but such as is committed in some court of justice, having power to administer an oath, or before some magistrate or proper officer, invested with a similar authority, in some proceeding relative to a civil suit or a criminal prosecution."

He then reviews the different punishments which at various times were meted out to perjurors by the English law. Our statute denounces as guilty of a high misdemeanor any person who shall willfully and corruptly commit perjury in 'any action, plea, suit, &c., depending or which may depend in any of our courts, &c., or in any deposition or examination taken or to be taken pursuant to the laws of this state before any public officer legally authorized to take the same (*Comp. Stat. p. 1748 § 18*), and makes the maximum punishment a fine not exceeding two thousand dollars and imprisonment not exceeding seven years, or both. *Comp. Stat. p. 1812 § 217*.

Doubtless, Breidt and Lubetkin know what perjury means, and that it is punishable as a high misdemeanor. The conclusion is irresistible that they knew when these supposititious affidavits were imposed upon the court that those three persons who were purported to have sworn to them before Breidt, but had only signed the paper and had not sworn at all, could not have been convicted of perjury even if the statements therein contained were false.

The rule governing disbarments, laid down by the supreme court (*In re Cahill, 66 N. J. Law 527*), is this:

"1. To justify the disbarment of an attorney, one of three things should be established: 1. Conviction of crime. 2. Evidence which, in the judgment of the court, shows that a crime has been committed and that the facts proven would justify a conviction thereof. 3. Such intentional fraud upon the court or a client as shows evidence of moral turpitude.

"2. For less offences, such temporary suspension as the court may deem proper punishment will be imposed."

Upon this whole matter I am clearly of opinion that the respondents are guilty of intentional fraud upon the court. Breidt, as well as Lubetkin, for Breidt knew the purpose for which they were to be used. True, they disclaim intentional wrong-doing, but what they did was done with knowledge and deliberation, and must, therefore, despite their denials, be held to have been done intentionally. Lubetkin knew that only affidavits would be considered by the court, and he therefore drew affidavits in form. He went further and procured the signatures of the named affi-

ants.   It is impossible to believe that he, knowing he could only prove a case by affidavits, at the same time thought they need not be sworn to.   Breidt deliberately certified to the falsehood, and he knew that he did so.   They imposed upon a court of justice papers which could properly have been used only in a moot court.   I repeat, they are guilty of fraud upon the court.

Proceedings to discipline a solicitor are civil and not criminal; and their purpose is not to punish the respondent but to purify the bar and protect the court and the public from the fraud and imposition of reckless and unscrupulous lawyers.   And yet, after all, I know of no better term in which to characterize the plight of a disciplined solicitor, one disbarred or suspended, than as "punishment."   That is the term used by our supreme court in the *Cahill Case,* and it amounts to punishment by whatever name called.   It involves disgrace to the solicitor and takes from him a privilege, the enjoyment of which brings him business and the means of livelihood.

Now, it will be observed that in the *Cahill Case* the supreme court said that conviction of a crime, or evidence that an attorney had committed one, or such intentional fraud upon the court or a client as shows evidence of moral turpitude, will justify disbarment.   It does not say that disbarment must needs follow the establishment of either one of the three.   This, of course, is so, as the extent of the punishment always rests in the sound discretion of the court.   So that, even if the respondents to this rule are guilty of intentional fraud upon the court, they need not necessarily be disbarred.   For less offences than those mentioned, it will be remembered, the supreme court said temporary suspension would be "proper punishment."

The offence of these young men is, in a sense, a novel one— that is, there is nothing like it to be found in the books, at least so far as I have been able in a very careful search to discover.

The supposititious affidavits were, in point of fact, true, and a receiver was appointed for the defendant company.   Here was no case of attempted fraud upon clients, that most reprehensible and detestable practice, resorted to by, I am happy to say, but few lawyers.   Nor was any fraud worked upon the court in the sense that affidavits false in fact were imposed upon it.   Lubetkin,

with reckless zeal for clients' interests, and Breidt, in over-weening friendship for Lubetkin, lent themselves to the perpetration of a fraud, harmless, however, in its consequences. This view of the situation is the one and only thing that saves them from the severest penalty.

*In the Matter of Robinson, 140 N. Y. App. Div. 329,* Ingraham, P. J., said (at *p. 337*) :

"We also take into consideration the fact that the respondent's conduct, grave though it was, does not appear to have been induced by any sordid motives of personal gain, but to have resulted from excessive and ill-judged zeal to protect his clients from an impending catastrophe. This does not excuse, but in some degree serves to palliate his offence. In consideration of these circumstances, the court has concluded that it is not required to proceed to the extreme penalty of disbarment, but that the respondent should be suspended from practice," &c.

The matter of discipline in this case was brought by me before a conference of all the judges of the court of chancery, and, after most careful consideration, it was our unanimous opinion that the administration of justice and the protection of the court and clients does not require the permanent expulsion of these respondents from the chancery bar, but that some and severe discipline is necessary to warn such members of the profession as may in like case hereafter offend. It is considered by us, and by our unanimous judgment, the punishment to be imposed in this case will be three years suspension for Lubetkin and two years for Breidt. If, in the future, any other solicitors should be guilty of such like offence, they need not expect such lenient treatment.

An order will be entered that Jacob Lubetkin be prohibited from practicing as a solicitor in chancery for a period of three years from the date thereof, and that Joseph B. Breidt be likewise suspended for a period of two years, with provision that if the order be violated the offender shall be permanently debarred from practicing as a solicitor.