In the Matter of HARRY FIELDSTEEL (Formerly Known as HARRY FELDSTEIN), an Attorney, Respondent.

First Department, March 10, 1930.

*Samuel A. Berger* of counsel [*George I. Gross* with him on the brief; *Isidor J. Kresel,* attorney], for the petitioners.

*Emanuel Sustick,* for the respondent.

DOWLING, P. J. Respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term of the Appellate Division of the Supreme Court of the State of

New York, First Department, on June 18, 1912, under the name of Harry Feldstein. There is no record in the roll of attorneys of any change of name by him.

The petition herein charges that respondent has been guilty of misconduct as an attorney at law under four general counts, as follows: Solicitation of personal injury claims, with thirty-one specific instances of solicitation set forth; converting to his own use various sums of money of clients, with four specific instances alleged; failure to obtain court orders fixing his fees in infants' cases, with five instances alleged; and failure to comply with the provisions of court orders fixing his fees in infants' cases, with four instances alleged.

Respondent answered the petition denying the charges, whereupon the matter was referred to a referee to take testimony in regard to the charges and to report the same with his opinion.

During the course of the hearings before the referee a general charge was added to the petition charging the respondent with the mingling of trust funds with his own.

The referee has duly reported and petitioners now move that respondent be adjudged guilty of professional misconduct and for such further action as the court may deem proper.

For failure to prove or sustain the charges in certain cases, petitioners admit such charges should be dismissed. This applies to thirteen alleged instances of solicitation (lettered " f," " g," " i," " j," " k," " m," " n," " p," " s," " t," " u," " w," " z "), two alleged instances of conversion (lettered " ii " and " jj "), one alleged instance of failure to obtain court order fixing fee in an infant's case (lettered " ll "), and one alleged instance of failure to comply with the provisions of the court order fixing his fee (lettered " tt "). In accordance with the recommendation of the referee in connection with specification " tt," respondent is directed to pay to Lena Oberlanger, the mother of Nathan Oberlanger, the sum of thirteen dollars and fifty cents, with interest from May 1, 1926. In passing we express the opinion that the counsel for petitioners was lenient in accepting respondent's explanation in this instance. There was a charge of misappropriation, specification " xx," developed on the hearing in connection with specification " w," but as the hearing progressed this misappropriation charged was shown to be without foundation.

The referee found that solicitation was proven in only three instances. No attempt was made to refute the testimony of the claimants in these instances. Respondent offered the explanation that one case came through a neighbor, another through a barber, and the third through a policeman. These individuals were not

produced to corroborate respondent as to the alleged recommendations. In the first of these instances, the Mayer case, the testimony by Mrs. Katie Mayer is that her son Walter was injured; that respondent was the lawyer in that case, although she did not know him and had never met him; that she retained respondent through a man named Fishman. She said, " Mr. Fishman came to the house and asked for the case and I gave it to him." Fishman told her he was a " runner " for Mr. Fieldsteel and he said he got a commission for all the work he did. Mrs. Mayer testified that she had never met Fishman before and did not know him and had not heard of him. This is the case which respondent testified came to him as the result of a neighbor's recommendation. The testimony shows similar solicitation in the other two instances. In the Friedman case the solicitor was described by Sam Friedman, the father of the injured infant, Morris Friedman. It is admitted that the description fits respondent's employee, Samuel Leow. In this case respondent suggests recommendation by a barber. Leow was also the solicitor in the Kaminsky case, which respondent claimed came to him as a result of a policeman's recommendation.

A reading of the record satisfies us that solicitation was established in other instances in addition to the three found by the referee. In the Geldberg case (lettered " d ") it is probable that the efforts of Miss Weiss, a sister-in-law of respondent's brother-in-law, caused the contact between Miss Geldberg and respondent's office. Miss Geldberg's testimony convinces us that she made no request to have either respondent or his representative call on her; that as a result of her discussion of her accident with her office associate, Miss Weiss, Fishman called at her home. She did not know. Mr. Fishman. What happened at this call is best explained in the following extract from her testimony: " Q. What did he say? A. He said that he had heard that I had had an accident and that he would like to hear the particulars of my case and perhaps in some way he could help. Q. What else did he say? A. And I asked him why he felt he could handle my case so successfully. Q. What did he say? A. He said they had had similar cases and they were all settled satisfactorily. Q. Did he exhibit anything to you? A. Yes. Q. What did he exhibit to you? A. Photostat copies of cases that had been settled. * * * Q. What were they photostats of, of legal papers or checks or what? A. Of some checks. Q. And were those checks in substantial amounts? A. Oh, yes, for large amounts. Q. What else did Mr. Fishman say? A. Well,— Q. I am not trying to get the exact words. We want the substance of the conversation between you and Mr. Fishman. A. Well, all the conversation that took

place was that Mr. Fishman was soliciting the case and trying to convince me that he had the proper lawyer who could handle it satisfactorily. Q. And who did he say was that proper lawyer? A. Mr. Fieldsteel. Q. Up to that time you had never met Mr. Fieldsteel? A. No. Q. Nor had you ever heard of him? A. No. Q. So far as you knew, you knew no friend or acquaintance or relative or any person who knew Mr. Fieldsteel up to that time? A. Up to that time, no, but I did mention — I was not employed at this office at the time of the accident. I did happen to mention in the office that I expected to give my case to a lawyer and I was acquainted with Mr. Fieldsteel's brother-in-law, and when he heard that I had met with an accident I understand that he acquainted Mr. Fieldsteel with the facts and that it was through he (*sic*) that he sent Mr. Fishman up to me."

Fishman would not tell the witness who had told him she had met with an accident. He did not mention respondent's brother-in-law, nor did he mention the fact that a person mutually known to the witness and respondent was the one who had recommended the case to respondent. There is the suggestion on the direct examination that this reference to respondent's brother-in-law was not mentioned at the investigation before Mr. Justice WASSER-VOGEL. That is immaterial. What is material is that she made no request to have respondent or his representative call. We have considered the testimony of Dewey Levitch, the brother-in-law of respondent, and, in view of the relationship, see no reason why his story should be preferred to that of Miss Geldberg, particularly as there is not the slightest suggestion of any motive which might prompt her to testify contrary to the actual facts. Fishman testified that he did not remember anything about Miss Geldberg.

In the Slavin case (lettered " e ") it is conceded that the description of the solicitor covers respondent's employee Loew. Mrs. Slavin, however, testified that the man introduced himself as Fishman. Respondent's contention is that Mrs. Slavin was recommended to him by her neighbor, Mrs. Zeitelin, a former client of his. Mrs. Zeitelin was not produced. Mrs. Slavin testified to an interview by respondent's representative along the lines of the interview in the Geldberg case. Speaking of the visit by the man who called himself Fishman, Mrs. Slavin said: " Why, he said that he had a very good lawyer and he would try to do his best with the case, and this lawyer works on a fifty fifty basis. And at first I did not consent to it, but then he talked so much and I finally gave him the case. * * * Well, he showed me different cases and said Mr. Fieldsteel won those cases and they were all satisfied,

all his clients were, so I thought I would give him mine, too." Mrs. Slavin admitted knowing Mrs. Zeitelin; that she told Mrs. Zeitelin about the case and Mrs. Zeitelin said she knew Mr. Fishman. Mrs. Slavin testified on cross-examination, after saying she knew Mrs. Zeitelin, as follows: " Q. Did she recommend Mr. Fieldsteel? A. No. After I told her about the case she said she knew Mr. Fieldsteel. Q. And she thought he was a good lawyer, didn't she? A. Yes, she told me she knew Mr. Fishman. She didn't mention Mr. Fieldsteel, she said she knew Mr. Fishman." It is not clear whether Mrs. Slavin spoke to Mrs. Zeitelin before or after Fishman's call.

This is another instance of respondent's representative calling without invitation on a person with a claim for personal injury and urging and securing the retention of respondent. Mrs. Slavin made no request to have respondent or his representative call upon her.

In the Krachy case (lettered " r ") the testimony of Annette Krachy, the sister of the injured infant, establishes solicitation. Respondent admits he represented the infant, but he had no definite recollection about the case. Miss Krachy's testimony is that while the ambulance doctor was still at their home, a man, who she thought was Mr. Fieldsteel, and who said he was from Mr. Fieldsteel's office and showed a card, came and, as she testified, " said that he would handle the case for my mother and he said he did not see why we could not get a couple of hundred dollars. Of course there was only one stitch taken right on her forehead, we did not feel as though we wanted to be involved in any courts, and he said but a stitch was a stitch after all and it was worth a couple of hundred dollars, and my mother told him to call back a few days later. So he did and finally we did turn the case over to him." As to this witness, the referee's report states: " Respondent's attorney alleged this witness was extremely hostile because of events that had transpired during the prosecution of her case." Nothing in her testimony indicates animus. In the absence of other testimony, the story of the intrusion of a stranger asking for the retainer for respondent must be accepted. Respondent accepted and profited by that retainer.

In the Bernstein case (lettered " hh ") Sam Bernstein, father of the injured infant Jacob, testified that he learned of the accident the day after it occurred through Mr. Leow. Bernstein testified that Leow came to his house the morning following the accident. He said: " He came over in the morning, because I had made up my mind to go to the station house to tell that the boy did not come home the last night, and before I was ready Mr. Leow came over and he told me that, ' You know, I am a lawyer myself;' and

I said, ' What do you want? ' He said, ' I came over to take the case from the accident to your son.' And I asked him what had happened with my son, and he thought I knew that something had happened, but I did not know anything. And then he told me that last night there was an accident with my son and they took him to St. Mary's Hospital, and if I want I could go with him in the machine and he would show me my son. That is the way I knew it first." Then, " Q. What else did Leow say to you at the time about this case or any other case? A. Well, after he told me we cannot wait long, I have to give him the case before it will be too late, and he made out an application and gave it to me to sign, after he took me with the mother to the hospital and the older son, he should sign it too, and that is the way how I found it out, and he took us with his machine to the hospital, and he made me to sign. I told Leow I wanted to wait a day or two to decide it and find out who you are, because I got friends maybe to give me another lawyer, but he told me, ' You know when an accident happens we have to do it quick.' " Whereupon Bernstein signed a retainer. Bernstein was not satisfied with the settlement obtained in this case, which is suggested as a reason for this testimony. Respondent's testimony is that the case was recommended to him by one Max Scherr who lived across the street from Bernstein. On cross-examination Bernstein said that Leow told him friends had telephoned him, Leow, about the accident. The credibility of Bernstein's testimony is further attacked on the ground that his story of learning of the accident through Leow for the first time the following morning is very unlikely. We think solicitation was established. How did this case come to respondent? On the record we are compelled to accept Bernstein's version.

The record contains much testimony relating to the efforts of respondent's representative to secure retainers in other cases. In many such cases it appears that the representative called after the injured person or some member of the family had made inquiry of some friend or acquaintance about securing legal aid. For example: In the Nettie Goldberg case (lettered " l ") the testimony indicates that Fishman called as the result of Miss Goldberg's mother talking with Mrs. Walkowitz and requesting the latter to send her lawyer. In the Benjamin Lichter case (lettered " q ") we are convinced Mrs. Lichter requested her friend Mrs. Poretz to phone for respondent, whom Mrs. Poretz had recommended as a good lawyer. In the Lipnich case (lettered " v ") it is possible Louis Haasner had been asked by one of Mrs. Lipnich's daughters to recommend a lawyer; despite the testimony of the

daughters living at home, the possibility of one of the other daughters having made the request was not eliminated. The patrolman, William H. Brown, would seem to have been responsible for respondent's getting the retainer in the Feil case (lettered " x "). In view of the conflict of the testimony of Mrs. Lena Kamen in the case of her son Arthur (lettered " aa "), given before the referee, in which she testified that she knew Mr. Fishman as the result of his passing her stand on the street, and the testimony before Mr. Justice WASSERVOGEL, when she testified she did not know Mr. Fishman and had not sent for him, we cannot say that this case was solicited. The Berman case (lettered " dd ") was a recommendation of Dr. Sacckett.

There is a group of cases which came to respondent as the result of the recommendation of Drs. Levine and Uviller. Solicitation is charged in these cases, but it is clear that respondent was retained on the recommendation of these doctors. It is remarkable, however, that on the settlement of these cases the sum withheld for payment to the doctor should lead to charges that respondent retained more than he was entitled to. In the Loffman case (lettered " oo ") twenty-five dollars was paid to Dr. Levine; Mrs. Loffman testified she paid the doctor for every visit and did not owe him anything. In the Cutler case (lettered " kk ") five dollars was for the doctor, although Mrs. Cutler contends that Leow told her it was for his expenses. Twenty dollars was paid to Dr. Uviller in the Chuda case (lettered " ss "), although Mrs. Chuda testified she was told she would not have to pay the doctor, and the red-headed man (Leow) said he would make it all right with the doctor from his half. The referee in his report states: " Many of the witnesses * * * did not seem fully to understand the nature and purpose of the proceeding and seemed to evince a fear that, in some manner, an investigation was being made as to whether or not they had paid all that was due to the doctor who treated them or their children." The suggestion in these cases is that the payments to the doctors were more in the nature of compensation for recommending the cases to respondent. That, however, was not established as a fact. The testimony as to payments to these physicians, coupled with the testimony as to payments of premiums on bonds, satisfactorily disposes of the charges that respondent in these cases withheld more than he was entitled to. That is true, too, in the Friedman case (lettered " rr "), in which twenty dollars was paid to Dr. Uviller. The Friedman case is one of those in which the referee found solicitation. The testimony of Salomkin satisfies us that there was no improper withholding in the Mashkow case (lettered " nn ").

In the Mayer case (lettered " pp "), another one of those in which the referee found solicitation, the infant's claim was settled for two hundred dollars, and the parent's claim for seventy-five dollars, making a total of two hundred and seventy-five dollars. The court order in the infant's case allowed respondent seventy-five dollars for his services and disbursements. This seventy-five dollars, plus the thirty-seven dollars and fifty cents due respondent on the fifty per cent retainer in the parent's case, made one hundred and twelve dollars and fifty cents, respondent's share, and the balance of one hundred and sixty-two dollars and fifty cents due the parent and guardian. Mrs. Mayer testified she received from respondent one hundred and thirty-five dollars, and produced her bank book showing the deposit of this sum. Respondent produced a check indorsed by Mrs. Mayer and also indorsed by Dr. Joseph Kotin, in the sum of twenty-five dollars. This is claimed by respondent to have been given to Dr. Kotin for medical attention to the infant. There is also testimony as to payment of five dollars for premium on a bond. This five dollars could not properly be charged against the amount coming to the parent and guardian because the court order expressly provided that the seventy-five dollars allowed respondent should cover disbursements as well as compensation. There is also testimony by Mrs. Mayer that Fishman told her the doctor would be paid by respondent from his part of the settlement. The referee in his report said: " The charge of failing to comply with the terms of the court order was, in my opinion, sustained, and in view of Mrs. Mayer's testimony, the charge of conversion of the $25 paid to Dr. Kotin was also sustained, although I believe the respondent was not guilty of deliberate misconduct in making the payment to the doctor as the check returned to his office bore Mrs. Mayer's signature."

There was no proof that an order had been obtained allowing compromise of the infant's claim in the Berman case (lettered " uu "). The testimony is that the infant's claim was settled for one hundred and twenty-five dollars and the parent's claim for seventy-five dollars. The parent testified he received ninety-five dollars. Respondent's testimony is that five dollars was for premium on the bond. The referee states in reference to the charge of failure to obtain the court order, " The burden of proving the allegation was on the petitioner." The parent testified he did not remember whether he signed an application for a court order. It seems to us in such a situation and in a proceeding of this character the burden was then on respondent to come forward. Failing to do so, we must find that he failed to comply with the provisions of the Judiciary Law (§ 474, as amd. by Laws of 1912, chap. 229) and

rule 294 of the Rules of Civil Practice governing the compromise of infants' claims. In the Friedman, Kamen and Chuda cases there is proof that orders allowing compromise were obtained, but no provision was made for compensation of the attorney. We have heretofore (*Matter of Goldberg*, 227 App. Div. 502) expressed our opinion as to the failure of judges signing such orders to observe this most essential feature intended for the protection of the infant's estate.

We disapprove of the close alliance between doctors and members of the bar, whereby doctors act as " feeders " for lawyers devoting most of their efforts to negligence practice, and the lawyers in turn act as collectors for the recommending physicians. In the instances disclosed in the record herein there is nothing that indicates the sums paid to the doctors were the reasonable value of the services rendered, and there arises a suspicion that such payments covered more than actual medical services. This suspicion is enhanced when the testimony of claimants repudiates any understanding that the amount of the payment was to be deducted from the sum coming to claimants on settlement.

We condemn very strongly the practice of attorneys, as disclosed by this record, accepting retainers on a fifty per cent or other basis and delivering to their clients a sum which, through deductions for disbursements or payments due physicians, is less than the percentage due under the retainer.

The record establishes that respondent's employees Leow and Fishman were actively engaged in the solicitation of cases for respondent. The referee has expressed it as his opinion that the employees were not hired for the purposes of solicitation. The testimony is too often repeated that claimants were approached by these employees, who were equipped with photostatic copies of checks, clippings, blank retainers, and the usual selling talk of solicitors, to allow us to escape the conclusion that respondent must have known, or should have known, that retainers were coming to him through the improper efforts of his employees.

Regarding the charge of mingling trust funds: The record discloses that it was respondent's custom to deposit moneys received on settlements, in which he had a part interest, in his own general account; that he immediately drew a check to the order of the client interested for the portion due such client. There is no evidence that any claim was made against him as the result of such practice, or that he ever used any part of said funds, or that his account was ever depleted below the balance required to meet such checks. Since the promulgation of the new Special Rules regulating the Conduct of Attorneys and Counselors-at-Law in this department in

February, 1929, respondent testified that he has strictly complied with the requirement as to special trust account. We agree with the referee that respondent was free from deliberate misconduct in this matter.

In disposing of this case we cannot refrain from expressing our appreciation of the thoroughness, earnestness and care with which the learned referee presented the evidence in his full and painstaking report and while we do not accept all his conclusions, we none the less respect his zeal and fairness.

For the misconduct of which respondent has been found guilty he should be suspended from practice for the period of two years, with leave to apply for reinstatement at the expiration of that term, upon proof of his compliance with the conditions incorporated in the order.

MERRELL, FINCH, McAVOY and PROSKAUER, JJ., concur.

Respondent suspended for two years.