In the Matter of PHILIP CASHMAN, an Attorney.

First Department, May 29, 1930.

*Isidor J. Kresel* [*Edward S. Greenbaum* and *Leon Leighton*, with him on the brief], for the petitioners.

*Ralph Stout*, for the respondent.

DOWLING, P. J. The respondent was admitted to practice as an attorney and counselor at law in the State of New York, at a term of the New York Supreme Court, Appellate Division, First Department, on November 8, 1915.

This is one of the proceedings growing out of the Ambulance Chasing Investigation. The matter is now before the court on a motion by the petitioners for such action as the court may deem just and proper, following the filing of the report and supplemental report of the referee appointed by this court to take testimony concerning the charges set forth in the petition and to report the same with his opinion thereon to this court.

Six charges are presented against the respondent. The first five relate to cases in which respondent was retained to recover damages for personal injuries sustained by infants. It is charged that the respondent failed to turn over to the guardians the full amount allowed them by the court orders authorizing the settlements. The petitioners now concede that in one of these cases there is no proof whatever of professional misconduct. As to the other four, the situation is well summarized in the following extract from the referee's report: " In each case the respondent instituted an action on behalf of the infant, through a guardian *ad litem*, and also instituted an action on behalf of the parent for loss of services. In each loss of service action, a retainer agreement was signed in which the respondent was entitled to 50% of the recovery or of the amount received in settlement, for his services, and the plaintiff was to receive the other 50%. All of the cases were settled through negotiations with insurance companies, insuring the defendants, before coming to trial. In each infant's case a

court order was signed approving the settlement and fixing the amount of the respondent's fee and directing that the balance of the settlement should be paid over for the benefit of the infant. In each case the respondent complied with the court order in the infant's case by turning over to the guardian *ad litem* a check for the full amount which the court had directed should be paid to the infant. At the same time, however, in settling with the parent in the loss of service action (the parent, in each of these cases, being also the guardian *ad litem*), the respondent after deducting his 50% of the settlement, made out two checks, payable to the parent, together aggregating the remaining 50% (except in one case, where an additional $7 was deducted to pay the premium on the bond, and one case where there was only one check, which the parent did not retain). One of these two checks was kept by the parent; and the other, after being endorsed by the parent was, according to the respondent's testimony, used to pay the bill of the doctor for services rendered to the infant."

The referee found as a fact that the amount deducted in each case was paid to the doctor and retained by him. As to two of the cases, the referee's report states: " The amounts retained by the respondent and paid to the doctors were not in excess of the reasonable value of the services rendered by the doctors and for which they had not been paid; so that the clients, in those two cases, apparently suffered no actual damage." As to the other two, the report states: " The evidence that the doctors were entitled to the amounts paid them was not so satisfactory; and it is not improbable that the clients would have objected to paying doctors' bills in those amounts, had they fully understood that they were making the payments themselves." There is no proof that the deductions made by respondent for the physicians were made by reason of any sinister motive or corrupt scheme on his part. There is no proof that he profited in any way thereby.

This is another instance in which an attorney has acted as the collecting agent for physicians recommending cases to him. We have expressed ourselves on several occasions on this situation. It is a bad practice and misunderstanding clients feel that they have ground for complaint. Even where the deductions are fully understood by the clients, suspicion attaches to the entire transaction and the thought presents itself that someone is getting more than he is reasonably entitled to at the expense of the client. We reiterate what we said in *Matter of Fieldsteel* (228 App. Div. 470, at p. 478): "We condemn very strongly the practice of attorneys, as disclosed by this record, accepting retainers on a fifty per cent or other basis and delivering to their clients a sum which, through

deductions for disbursements or payments due physicians, is less than the percentage due under the retainer."

The sixth charge relates to the case of an adult, Clara Conklin, arising out of her claim for personal injuries, and the claim of her husband, Patrick Conklin, for loss of services. Respondent was retained on a fifty per cent basis. Both claims were settled for the sum of $400. It was in connection with the payment of the portion due the Conklins that the trouble developed. Mrs. Conklin testified that she and her husband called at respondent's office on December 20, 1927, in response to his request that they call; that the respondent told her that to push the papers ahead on the case each of them was to pay $50 to a man to do so, that is, she was to pay $50 and respondent was to pay $50, and that would leave them each $150. She agreed to this. Under such an arrangement the amount coming to the Conklins would be $150. There was offered in evidence respondent's check dated December 24, 1927, drawn to the order of Clara Conklin and Patrick Conklin, in the sum of $200. The check bears the indorsement "In full payment of our share of settlement herein. Clara Conklin, Patrick Conklin Signature O. K. Please honor Philip Cashman." Mrs. Conklin's testimony is that she received but $150 from respondent. Patrick Conklin testified that he was in respondent's office but once; his testimony is that he told respondent that he could not get off from work all the time and he could not come down and respondent asked him to sign a blank check. "He [respondent] said, 'You sign this check and you will not have to come down when I call your wife down' he said, ' I will have the check ready and you will not have to come down, just the wife will come down.' " Mrs. Conklin testified that after a telephone conversation with respondent she and her mother, Mrs. Bland, called at respondent's office on Saturday, December 24, 1927. The testimony of the Conklins and Mrs. Bland is that Mr. Conklin did not call with them on Saturday. Mrs. Bland testified that she and her daughter, Mrs. Conklin, came to respondent's office on Saturday, December 24, 1927, at twelve o'clock; that she saw respondent hand money to her daughter. It was $150 in tens and twenties. The following is an extract from her testimony: " Q. Did you hear any conversation between your daughter and Mr. Cashman at the time when she got the money? A. Yes, sir. Q. Relate all that you heard Mr. Cashman and your daughter say on this day when she got the money? A. Well, I don't just remember exactly what she said. Q. Tell us as much as you remember. A. The only thing I know is that Mr. Cashman said that he had got the money because thinking that we would be down late, at least thinking we might

be down late, and he had gotten the money so that we would not be disappointed in receiving the money that she was after; so that I don't know whether they had any other conversation." She was positive that she saw the money pass from respondent to her daughter, saw it counted and was positive of the amount.

Respondent branded as unqualifiedly false the testimony of the Conklins relating to an arrangement to pay fifty dollars for a man to push the case ahead. He denied as well Mr. Conklin's testimony that he had him sign a blank check so as to save Conklin coming to his office. His testimony is that the release was executed on Tuesday and he arranged for the Conklins to phone him the following Saturday to ascertain whether he had received the check from the insurance company; that Mrs. Conklin phoned Saturday, was informed that he had received the check the preceding day, and it was arranged that the Conklins come to his office before twelve o'clock if they wanted cash and that they came to his office about eleven to eleven-thirty. His testimony as to what happened then is as follows: " Mrs. Conklin came down as I stated with her husband and her mother and I said, ' Well, I am going to draw these checks now. Will you please endorse them and then I will O. K. your signature, if that is what you want.' They said, ' Certainly.' I drew up one check which is marked in evidence as Petitioners' Exhibit 23. I drew this up myself, dated it December 24, 1927, on Saturday, check No. 3377, pay to the order of Clara Conklin and Patrick Conklin, in the sum of $200. I endorsed this check in my own handwriting, ' In full payment of our share of settlement herein.' My young lady was in my office at the time, and in my presence she saw me make this endorsement. She likewise saw Clara Conklin and I saw Clara Conklin sign her name underneath those wordings in her own handwriting. The pen was then given to Patrick Conklin and he got hold of the pen and he wrote with his left hand, ' Patrick Conklin.' I then drew up the receipt in their presence. I wrote out the words in ink, ' Clara Conklin against Vincento Romano, $400, $200 December 24, 1927,' and I saw Clara Conklin in my presence and in the presence of my stenographer and in the presence of her husband sign her name, Clara Conklin. * * * I then called Mrs. Bland to the other side of the desk and gave her the pen and said, 'Mrs. Bland, will you please attest your daughter's signature, that you saw her sign it.' I said 'You had better read it before you sign it.' She took the paper in her hand and she read it. * * * My young lady was there and I told her after Mrs. Bland read the receipt, which I saw her read, I told her to please attest it under Mrs. Bland's signature. I did not see any occasion for having

Patrick Conklin sign the receipt, because I generally have one attesting witness and he did not seem to be so cheerful about the entire affair anyway, and I thought it was perfectly alright to have Clara Conklin and her mother appear upon the receipt with my stenographer likewise attesting it. I then O. K.'d both signatures and I turned it over to Mrs. Conklin and I said, ' Mrs. Conklin, this will enable you to get the check cashed. There is my bank across the street. It is the same bank that your mother got her check cashed sometime ago.' And Mrs. Bland replied, ' Oh, yes, let me have the check, I know where the bank is and I can get the cash for her.' Mrs. Bland then politely took the check from her daughter's hand and took it in her hand and they walked out."

The check itself bears the bank stamp showing it was paid on December twenty-fourth.

Miss Louise Orsati, who was respondent's secretary at the time in question, testified in support of respondent's version of the happenings at the time of the settlement.

The referee reported: " If, in order to sustain this charge, I were obliged to find that it is established beyond a reasonable doubt, my finding would be for the respondent. I understand however, that, though the burden of proof is on the petitioners, it is my duty to make my findings in accordance with my opinion as to the weight of the evidence. On that basis, I find that the sixth charge has been substantially established."

Following the filing of the report of the referee, the respondent moved to reopen the proceedings on the ground of newly-discovered evidence, on the strength of an affidavit from the bank teller relating to the cashing of the check. The motion was granted and the matter referred back to the referee.

J. Harold Weaver, a paying teller in the Corn Exchange Bank, testified that it was his usual custom and general practice to place his initial " W " in pencil opposite the indorsement of the person whom he believed to be cashing the check. The following is an extract from his testimony: " Q. Look at the back of the check, Petitioners' Exhibit No. 23. Your initial there appears approximately opposite what name? A. Well, I should say it appears between the two names Patrick Conklin and Clara Conklin. It is approximately between them. Q. By looking at the back of that check, by whom would you say that check was presented to be cashed? A. By Clara Conklin and Patrick Conklin." Weaver testified that if respondent had presented the check with the indorsement of the Conklins on it, he would have asked him to indorse the check, but would not have asked him to put on it " Signatures O. K. please honor." If the check had been presented

by Miss Orsati, with all the handwriting on it, he would not have asked her to indorse it. His testimony is that he knew Miss Orsati by sight.

Respondent also testified again on the reopening of the proceeding. On this occasion he testified that while his best recollection is that Mr. Conklin was at his office on Saturday, December twenty-fourth, he might have been mistaken and Conklin might have signed the blank check on Tuesday. This change from his prior positive testimony that Conklin was at his office on Saturday and did not sign a blank check on Tuesday he attributes to his discovery that checks from his check book bearing a higher serial number than the Conklin check were dated earlier than December twenty-fourth.

The supplemental report of the referee states: " In discussing the evidence in regard to the Conklin case in my original report, I pointed out that there was a square issue of veracity between the Conklins on the one hand and the respondent and his secretary on the other; and one of the reasons given for my conclusion that the weight of the credible evidence favored the Conklins, was the circumstantial nature of their story and my belief that none of them had either sufficient motive or ability to invent a story so damaging to the respondent. The respondent's admission, however, that Patrick Conklin might have indorsed the blank check on Tuesday and might not have come to the office on Saturday, makes an important change in the bearing which that part of the Conklins' testimony has on this aspect of the case. If Mr. Conklin was not at the office on Saturday, his failure to sign the receipt is explained, and it becomes unnecessary, in order to accept the respondent's version, to find that the Conklins invented the part of their story relating to the actions of Patrick Conklin. This still leaves an issue of veracity between Mrs. Conklin and Mrs. Bland, on the one hand, and the respondent and his secretary, on the other, on the question whether he gave them the check for $200 or $150 in cash; but, if the respondent and Miss Orsati had originally testified that Patrick Conklin might have indorsed the check on Tuesday and might not have been at the office on Saturday, I would have felt little hesitation in giving credence to their story, rather than to that of Mrs. Conklin and Mrs. Bland, in regard to the delivery of the check. " With the evidence as it now stands, my greatest difficulty in accepting the respondent's story arises from the positive nature of his previous testimony and that of Miss Orsati, that Patrick Conklin came to the office on Saturday and endorsed the check then. At the earlier hearings, the respondent suggested, as a motive for the Conklins' testimony, that they wished to injure him

478

because he had refused to make an advance to Mrs. Conklin; while at the last hearing his suggestion was that, if Mrs. Conklin and her mother came to the office alone on Saturday, they might have conspired to ' hold out ' $50 on Patrick Conklin by telling him they received only $150 instead of $200.

" Although the respondent's explanation is not entirely satisfactory and the evidence does not leave the facts entirely free from doubt, I now feel that the doubt should be resolved in favor of the respondent and that my finding must be that the sixth charge has not been sustained by the weight of the evidence. It is possible that the respondent and Miss Orsati were honestly mistaken in their first recollection as to Patrick Conklin's presence at the office on Saturday and that their somewhat too circumstantial account of what happened that day was not due to any intention to deceive the Court, but rather to their great anxiety to establish what they believed to have been the facts."

The question determining this sixth charge is, who cashed the check on December twenty-fourth? There was testimony that Mrs. Bland had had prior experience in cashing checks of respondent at the bank. This coupled with the testimony of Weaver makes it strongly probable that the check was in fact cashed by Mrs. Conklin. Because of this we are reluctant to disturb the conclusion reached by the referee.

The report of the learned referee should be confirmed, and the proceedings dismissed.

MERRELL, FINCH, McAVOY and SHERMAN, JJ., concur.

Proceeding dismissed.