In the Matter of FANNIE HOROVITZ, an Attorney, Respondent.

First Department, March 10, 1930.

*Isidor J. Kresel* of counsel [*William L. Wemple* and *Abraham Freedman* with him on the brief], for the petitioners.

*Harold R. Medina* of counsel [*James J. Regan* with him on the brief; *Medina, Sherpick & Mc Kee*, attorneys], for the respondent.

DOWLING, P. J.   The respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term of the Appellate Division of the Supreme Court of the State of New York, First Department, on May 15, 1906.

The petition charges the respondent with misconduct as an attorney at law in soliciting retainers from persons injured in accidents; employing persons, not members of the bar, to solicit such retainers; giving and promising to give to persons, not members

of the bar, considerations for inducing persons in accident cases to retain the respondent. Six specific instances of solicitation were set forth in the petition. The petition further charges that in cases involving accidents to infants respondent failed to comply with the orders of the court fixing her fees, and retained larger sums than were allowed, and in other cases involving accidents to infants she failed to obtain court orders approving settlements and fixing her fees. Respondent answered the petition and the matter was referred to a referee, whose report is now before the court for action.

Before the referee the petitioners offered evidence of an additional charge (not mentioned in the petition) of the failure of the respondent to account to a client for the proceeds of the settlement of his case. Over the objection and exception of respondent's counsel the referee took the testimony and evidence of the parties. It was proper for the referee to take this proof. It does not appear that the respondent was in any way prejudiced or prevented from offering any proof she saw fit. Louis Raberich, whose testimony formed the basis for the additional charge, was first called at the first hearing before the referee on April twenty-third, and then excused. He was called again on May seventh. The final hearing before the referee was on June twenty-fifth. It thus appears that ample time was allowed respondent to meet this additional charge. In fact, the hearings were not definitely closed at the last meeting before the referee. The action of the referee obviated the necessity for a motion for leave to amend the petition and a further order of this court.

Petitioners offered no proof of the charges in cases involving infants where it was charged that respondent failed to comply with orders fixing her fees and retained larger sums than were allowed; nor was any proof offered as to the charge of failure to obtain court orders approving settlements and fixing fees in infant cases. These charges, lettered (j) and (k) in the petition, are dismissed.

Petitioners offered proof involving only five of the six specific instances of solitation set forth in the petition. As to two of these, the Vollmer and the Duffy cases, the referee found there was no solicitation. It is possible that Mrs. Schwartz, in the Vollmer case, recommended respondent; and that, in the Duffy case, the stranger, apparently a friend of Mr. Duffy's friend, likewise recommended respondent. In any event, on the testimony the referee was justified in reaching his conclusion.

In the O'Connell, Levy and Trotman cases there was undoubtedly solicitation, as found by the referee. In fact, in these cases there was " ambulance chasing " in the literal sense. David O'Connell

testified that his son, John, was injured in June, 1926, and taken to the Flower Hospital. He learned of it when he came home from work and then he went to the hospital. It appears that the boy was held at the hospital for the purpose of having an X-ray taken. O'Connell's testimony is, in part, as follows: " Q. Did any man interview you while you were at the hospital? A. Well, yes, there was one man — just one man in particular who bothered me about a dozen different times while I was there, and each time I put it off. I didn't have time to bother with him."

There follows questioning on behalf of respondent during which it was developed that O'Connell did not know the name of this man, nor could he identify him, but that he signed some paper for him. Then, " Q. You stated that you signed a paper for him? A. Yes, I did. Q. Did you do that at the hospital? A. No, not in the hospital; on the car — on the automobile. He brought me out while I was waiting to have the X-ray taken. Q. You went to him? A. No, I did not. He brought me out on Avenue A. Q. Did he have an automobile there? A. Whether it was his or not, I do not know. But there was an automobile there and this cop on duty there told me the man was all right and that he knew him. Q. What did he say to you when he approached you? Mr. Medina: Does he mean the cop, or does he mean the man. Q. The man. A. He asked me if I wanted a lawyer, and he represented a good lawyer, and he would take up the case for me. Q. Did he tell you what good lawyer it was that he represented? A. Yes, he did. Q. Whom did he say? A. He said that he represented Fannie Horovitz, and I didn't know one from the other at the time I did it. If I had any lawyer friends of my own — if I knew what I did, I wouldn't have to go there — Mr. Medina: I move to strike that out as improper and not responsive. Q. What did you say to this man when he first asked you about getting a lawyer? Mr. Medina: I make the same objection as in the case of the other witnesses. [Objection overruled; exception to Mr. Medina.] A. At that time I told him that I did not have time to bother with him. That I had too much in hand just now. Q. Did he come to you again while you were still in the hospital? A. Yes, he was back again; I didn't leave the waiting room. That is as far as I got; and I was in the waiting room and he came to me at different times. Q. That was all the same afternoon? A. All the same afternoon. I was there only three or four hours, at the most. Q. After repeated approaches, you went to the automobile with him? A. Yes, I signed a paper and I did not even read it."

Respondent acted for O'Connell in the matter. It is not claimed that any other retainer was obtained, nor is it denied that the

retainer was obtained in this manner. Respondent testified she had no recollection as to how the case came to her office.

In the Levy case Louis Levy testified that his father, William Levy, was injured in November, 1924 or 1925, and taken to the Presbyterian Hospital. Louis went to the hospital, and as he was leaving there with his father two men came in. Louis testified: " I was talking to my father about getting a taxicab to take him home, and these two gentlemen said they had a car outside and would help me to take him home, and I figured that in a case like that I would take the helping hand and go along with them, and my father was given crutches and he was put into the car, and they drove over to the house, and when they got out of the car, one of these men noticed that my father could hardly move, and he said, ' If you want me to, I will assist you upstairs,' and they carried him upstairs in the house.

" While he was in the house, these two men started in talking and explaining about the cases that a lawyer by the name of Fannie Horovitz had and that she won so many cases and showed newspaper clippings. Well, I told them to just wait a couple of minutes, and I would call my brother up and find out from him, and after waiting for some time my brother arrived, and when he arrived I explained to him what they were talking to me about, and these two gentlemen asked me if I wanted — or if my father wanted to retain Fannie Horovitz as the lawyer, and after a few minutes conversation between my brother and myself, we decided to give Fannie Horovitz the case."

Respondent was unable to explain how the Levy case came to her office, claiming she had no recollection thereof.

Charles C. Trotman testified that his daughter Mildred was injured some years ago; she was taken to the hospital in an ambulance and then brought home by some boy on a truck. About an hour after the child was hurt, two men, strangers, called at the Trotman home and asked for the case for Miss Horovitz. " They only asked me to give them the case for a great lawyer, Miss Horovitz. That is all I remember about that." Trotman subsequently called on respondent and signed in her office.

No explanation is offered by respondent as to how this case came to her.

The testimony which was the basis for the supplemental charge was given by Louis Raberich, corroborated on the vital point by his wife, Anna Raberich. While the circumstances attending the retention of respondent to represent Raberich in his personal injury action indicate solicitation, it is not that with which we are now concerned. Respondent did represent Raberich and his

claim was settled for $2,350. Raberich and his wife testified with positiveness that the amount received from respondent was $1,045. The retainer was on a fifty per cent arrangement, under which the sum turned over to Raberich should have been $1,175. Respondent testified that within two or three days after the receipt of the check in settlement she had a talk with Raberich. Respondent testified: " I paid him his share of the settlement at that time. I went over the amount of the settlement with him and told him that there had been some disbursements. In that particular case the disbursements had been high, and I don't remember exactly what proportion, but some portion of it was charged up to him." No evidence was furnished by respondent as to what the disbursements were. Jacob S. Spiro, who acted as New Jersey attorney in the matter, testified for respondent. Before the referee Mr. Spiro was unable to state exactly what amount he received from respondent for his services and disbursements. A letter received from him states, " the amount received by me from Miss Horovitz in the Raberich matter was $316.66, after crediting Miss Horovitz with $25.00 advanced to me by her towards disbursements." This certainly does not clarify the situation as to what the disbursements were. Arthur A. Hirsch, who did special investigation work for respondent, as well as " hard services of summonses and any general work that might be done around the office at any time," testified that he rendered a bill for the services he performed in connection with the Raberich case. Asked how much it was, he said, " I cannot remember offhand. I believe over a hundred dollars, if I am not mistaken." He did not have a copy of the bill.

Respondent did not produce any records of her own in the Raberich case. Mr. Spiro did produce his file, which, however, was not helpful on the question of disbursements.

The report of the referee states the following conclusion on the Raberich case: " In the opinion of the Referee the net result is that the respondent has not accounted and is unable to account to Louis Raberich for the difference between $1,045 and $1,175 — to wit, the sum of $130 and should be required to pay this amount to him." The respondent contends: " The real reason for the finding is apparent on the whole report. The Referee is charging Mrs. Horovitz with owing this amount to Raberich solely because she has no records of her disbursements. That only is the basis for this finding."

Taking respondent's testimony at its face, a portion of the disbursements were to be charged to Raberich. What was the total of the disbursements? Hirsch's testimony is that his bill was over $100. How much over? The best we have is a minimum

of $100. Spiro's testimony is that $25 was advanced for disbursements. This $25, plus Hirsch's $100, make $125, the utmost shown, not all of which was to be borne by the client. We have considered the type of individual Raberich is, as pictured in the report and the record. Respondent willingly represented him and knew exactly what conditions she was called upon to meet and should have dealt with the situation with the greatest exactitude. It is urged that " there is no reason why an attorney in a transaction of this sort should be required to produce any greater or more convincing evidence than would an ordinary business man." In urging this the peculiar relationship of attorney and client is overlooked. An attorney who accepts a retainer on a fifty per cent arrangement and on the settlement delivers to a client less than fifty per cent of the amount received in settlement, even though an independent arrangement as to disbursements is claimed, should be prepared to demonstrate that there was no overreaching. The most convincing proof of full payment would be the production of the record. In the absence of the record we think the items of disbursements should have been established, if, as respondent claims and the nature of the case would indicate, they were unusual. It is precisely this sort of conduct that is calculated to bring the profession into ill repute.

The record justifies the conclusion of the referee on the charge growing out of the Raberich case.

Although the referee found that there was solicitation in the O'Connell, Levy and Trotman cases, he also found that there was no evidence as to the identity of the solicitors nor proof that they were employed or paid by respondent for their services in soliciting and procuring the retainers. The record is undoubtedly silent on these points. We think the circumstances disclosed are most suspicious, and the use of newspaper clippings relating to respondent by those who were active on her behalf is most significant and one of the usual evidences of the practices of professional " runners." If the individuals securing the retainers for respondent were acting as a matter of friendship, respondent was most fortunate, and it is singular that such good friends preserved their anonymity. The most that can be said is that respondent's participation in these three cases is not sufficiently proven.

The report of the referee will be confirmed and the proceedings dismissed.

MERRELL, FINCH, MCAVOY and PROSKAUER, JJ., concur.

Proceedings dismissed.