In the Matter of JULIUS L. ROSENTHAL, an Attorney, Respondent.

Second Department, March 19, 1937.

*Bernard J. Ferguson,* for the petitioners.

*Benjamin C. Ribman,* for the respondent.

PER CURIAM. Respondent was admitted to the practice of the law in 1911. His office was in the borough of Manhattan, but he had considerable practice in Queens county. He is charged with:

(1) Having paid certain laymen for soliciting negligence cases in violation of statute and the canons of ethics;

(2) Having paid a layman for procuring counsel work for him;

(3) Failure to produce records of financial transactions in an investigation conducted before Hon. LEANDER B. FABER, a justice of the Supreme Court, pursuant to order of this court.

The charges were referred to an official referee to report thereon, with the testimony. The official referee has recommended that the charges be dismissed.

The court cannot accept that recommendation, for the proof demonstrates beyond doubt that respondent had paid certain individuals for procuring negligence cases for him.

It was conceded that counsel work was procured for him by one of his employees, and there is little doubt that he paid that employee therefor. This would seem to be in violation of sections 270-a, 270-d and 275-a of the Penal Law.

There is indication also that respondent failed in his duty to present all his financial data before Mr. Justice FABER in the said investigation.

However, these two items will be laid aside for a consideration of the more serious charge.

Respondent had in his employ certain individuals regularly, and others from time to time, who were thoroughly experienced in this so-called negligence work. They had been employed by casualty companies and by other lawyers. As to cases in which these men and others procured retainers for respondent, there was sufficient proof presented before the official referee to justify the inference that they were paid. It is hardly likely that they would be willing to serve respondent in this respect just for the pleasure of it. It will not be helpful to detail the testimony. However, respondent stoutly denied that he had paid any of these men, or anybody else, for procuring a case for him.

Even if one would be inclined to look with favor on respondent's denial in view of his prior good reputation and the serious consequences to him of discipline, it would be impossible to accept it because respondent's credibility has been shattered by other proof, some of which at the same time directly indicates his denial was at variance with the fact.

Respondent produced before Mr. Justice FABER the books and papers he said were in his possession. He had a checking account. Immediately upon receipt from his bank of canceled vouchers, he destroyed all of them except those which were checks payable to clients in all his cases. He testified that this had always been his practice. When asked how he would explain any of the transactions involved in the destroyed checks in the absence of the vouchers, and also the matter of his Federal and State income taxes, he said he never gave it a thought; checks did not mean anything to him; they took up much room for a small office. The stubs of the checks he did keep, and in some instances they contained the name of the payee, but in many instances for a period of five years they were payable to cash. Respondent kept a black-covered book, loose leaf, which was a record of receipts and disbursements from 1930 to 1935. The entries were generally made five or six months after the expenditures were made, and were sometimes made from the check book, and sometimes when the check was to cash, from certain slips that he had. He no longer has the slips. He had made no entries for the year 1936, because the book had been subpoenaed; but he had no slips for 1936. At times, in making these entries in the black book, he had to " conjecture " from diaries and his files on cases in order to determine

receipts and expenditures. In this black book there are numerous items with the names of persons indicated by initials, and a large part of these initials are of men whom respondent said he was paying as investigators. The checks for these were generally payable in cash. It appears that respondent did not keep accurate books of account, and was thus able to conceal the exact nature of certain transactions.

Respondent had tried cases for defendants who were insured by a casualty company, of which one Harry Weinstein had been treasurer. That company went out of business, and Weinstein was employed by respondent in 1934. Weinstein had procured a number of cases for respondent, including a large number in which respondent acted as counsel. At the time of the hearing Weinstein's salary was $50 a week. When Weinstein first came to respondent he knew that Weinstein had been making $100 or more. He told Weinstein that he could not pay him any such salary, but that as soon as he was able he would pay him $50 a week, expecting Weinstein to procure counsel work for him. He had the following arrangement with Weinstein: That his salary was to be considered $75 a week, and respondent was to pay any debts that Weinstein had to pay and carry him along until respondent was financially able to do better for him. Under that arrangement Weinstein went to work, and respondent advanced money to him which he has debited as part of the $75 a week that he intended to pay. From time to time he would make advances to Weinstein, such as paying the premium on his policy. Then he would make a computation of the amount advanced and the account would run $300 one way or the other. Of course, this procedure afforded opportunity for hiding the real purpose of payments to Weinstein. In this connection it should be noted that in the month of December, 1935, according to the black book, Weinstein received five $50 payments, and in addition one of $250 on December twenty-first. Respondent said it was just before Christmas and Weinstein wanted some money, and instead of drawing his $50, he wanted $250 and respondent gave it to him. That made a total of $500 received by Weinstein during that month. This is significant.

Halpern, not a lawyer, who was the managing clerk at $25 a week, is charged with $350 for the month of December, 1935.

The charges to Weinstein and Halpern in December, 1935, and several other months during that year, are interlined and were made subsequent to other items. Respondent explained this by saying that when he made the book up, he kept the payments to these two men on a slip of paper and it was not handy. However, before he made out his income tax return he inserted all these pay-

ments. He said he did not make the entries in the black book consecutively; sometimes he would go back to a past date.

In May, 1932, respondent received a fee of $450 in a case in which one Martino was plaintiff. He has an entry in the black book, under date of May 6, of $300. He says this was his net fee. Under date of May fourth, the following item appears: " Pd. H. W." " Martin 150." Martin is admitted to be Martino. Harry Weinstein was not in his employ at the time. He was at the time, as stated, treasurer of a casualty company for which respondent tried cases. Respondent said he did not know who " H. W." was. He did not recall how he obtained the Martino case; he did not even remember its name. Harry Weinstein had absolutely nothing to do with it. The entries are in respondent's handwriting. The file of the case is in his office. The entries tell their own story.

In January, 1934, respondent received a gross fee of $750 or $755 in a Douglas case. In the black book, in his handwriting, there is the entry of a receipt of $340, which, he said, was his net fee in this case. On that same day, among the expenditures are found four items, aggregating $415, of which three items, aggregating $60, were payments to two lay witnesses and a doctor, and $355 to " H. W." At this time Weinstein was not in respondent's regular employ. Respondent says that out of $695, $355 to Weinstein was a fair fee, because it included a trip of someone to Washington to bring on the witnesses, and also, as respondent thought, for the settlement of the case by Weinstein. No recorded or other details are given why such a large sum should have been paid to Weinstein. This seems to be remarkable, in view of the fact that under that same case charges as low as fifteen and twenty cents are recorded. Other than the $340, there is no entry of the receipt of a fee in the Douglas case, although respondent said he thought his fee was $1,000, one-half of the amount collected.

Under date of December 18, 1935, there is an item in the black book, " Misc. Dist. $500." During the month of December, 1935, there were items listed as miscellaneous disbursements amounting to $878.75. This is a large sum, compared with other disbursements. While respondent was not asked to explain, and in all likelihood could not explain these items because he had no slips or other data, such entries justify the inference that something was hidden behind them.

In 1931 respondent had been retained in an accident case in which some people by the names of Lazaire and Norhadian were injured. In the record it has been called the Norhadian case. The cases were settled March 23, 1932, for $5,000. Respondent says his share was $1,200. There is no entry in the black book of this

receipt. Under date of April 4, 1932, the following entries of expenditures appear: " Norhadian. Pd. A. H. 30; Pd. O. K. 200." It is conceded that these cases had been recommended to respondent by one Oscar Keosayian. The latter testified that he had received nothing from respondent. Respondent said he did not recall who " O. K." was; he did not use the initials " O. K." for Oscar Keosayian; he paid Keosayian nothing. When asked if there was any other person he knew who had the initials " O. K." he answered, " My father-in-law's name is Harry Kramer ' H. K.' " Respondent conceded that the entry was " O. K." It was made in his handwriting. In the check stub book there were two checks, dated April 6, 1932, aggregating $200, to the order of cash. For these respondent could not account. The checks had been destroyed. His file would not disclose the purpose of any expenditure of $200 on April fourth. He had no recollection of the $200 payment in the Norhadian case. The charges made against respondent did not include a payment to Keosayian for procuring cases. Counsel for the petitioners suggested that it could be admitted on credibility. There was no serious objection to the testimony; there was no claim of surprise, and it might be readily accepted as proof of the fact. (*Matter of Horovitz*, 228 App. Div. 484.)

One of the men whom respondent had in his employ, as he says, was J. E. Bowden. Bowden had been with respondent for five or six years. He left respondent's employ in 1930, although payments were made to him in 1931. Respondent said Bowden was an investigator, adjuster, preparation man, and a server of papers. For any work he did he was paid. He never gave him a salary. He said Bowden had recommended cases to him, but was not paid therefor. Respondent was being interrogated concerning payments to Bowden, and he said he would allow him $5 in one case, or $10 in another, or $17 which would include his disbursements, in a third. Rather than make out individual separate checks, respondent would keep a record of it on a sheet of paper, and at the end of the period, a designated period — or else he would need some money, respondent would say that they would add it up and see what was owed to date; and he gave him a check, and it usually would come to an odd amount. It seems when respondent gave this testimony he was testifying concerning 1931 payments. He was not asked concerning 1930 payments, as to which the black book represents rather an interesting situation. On the one hand is respondent's testimony that his payments to Bowden were in small sums for investigating cases; on the other hand is his own record in 1930, from which it appears that, excluding July and August, respondent paid to Bowden, under the initials J. E. B.,

the sum of $3,891.15 in 100 payments, ranging from $5 to $150; 32 being for $50 or over, and 23 for less than $50, but $25 or over. The sum paid was about fourteen per cent of the entire net fees of respondent, as indicated by his black book. It may be that some of this money was for disbursements, but surely the larger part could not have been for investigations, etc., at the rate of $5 or $10 a case.

Although Bowden was no longer in his employ, in 1931 respondent paid him the sum of $1,449.90, in 23 payments, ranging from $4.40 to $310, there being five payments of over $125. Concerning the largest, $310, it appears that this sum was paid in an action in which Bowden's sister was plaintiff. Respondent says the action was settled for $4,000. According to the black book respondent received $700 as his own fee. He says $310 was given to Bowden for services and expenses at the request of the sister and because respondent did not want to profit at her misfortune.

There are expenditures in his black book which respondent was unable to explain, and toward the end of the hearing he was asked if he cared to make any explanation about the payments in cases where his book of accounts shows the initials of a payee, and his check stub book shows a payment to cash, and he answered: " I haven't any explanation to make."

The official referee must have overlooked some, if not all, of the items just discussed.

It might have been found that the checks not produced were destroyed in anticipation of the investigation conducted in Queens county by order of this court.

The foregoing method of keeping accounts, and the proof with reference thereto, indicate that this respondent falsified when he testified that he did not pay for the procurement of cases.

A failure to keep a simple detailed account of receipts and disbursements, together with supporting vouchers, is apt to lead to unfavorable inferences.

Respondent is a man of no inconsiderable experience. He tried cases for plaintiffs, and also for defendants who were insured by casualty companies. He was retained as counsel. He knew of the investigations and hearings and decisions in connection with " ambulance chasing " in 1929–30. In the face of the warning issued by courts through their decisions and the discipline of members of the bar, respondent, heedless of consequences, engaged in a practice for which he knew others had been disciplined.

There is no choice here. The respondent should be disbarred and his name ordered to be struck from the roll of attorneys.

Present — LAZANSKY, P. J., CARSWELL, JOHNSTON, ADEL and CLOSE, JJ.

Respondent disbarred and his name ordered to be struck from the roll of attorneys.