## IN THE MATTER OF DOUGAL HERR, AN ATTORNEY AND COUNSELOR AT LAW.

Argued September 5, 1956—Decided October 4, 1956.

278

*Mr. James A. Major,* by direction of the court, argued for the order to show cause.

*Mr. Edward R. McGlynn* argued in opposition to the order to show cause (*Mr. Leon W. Kapp* and *Mr. McGlynn,* attorneys for and of counsel with respondent).

The opinion of the court was delivered by
WILLIAM J. BRENNAN, JR., J. Respondent has been called upon to answer specific charges of alleged unethical and improper conduct, principally that in various ways, for his personal profit and gain, he abused and took advantage of the confidence reposed in him by his client, Miss Bertha Breckwoldt. By direction of this court hearings on the charges were had before Judge Grimshaw in the Chancery

Division. Judge Grimshaw filed conclusions finding that some charges were sustained by the evidence and others were not. Briefs were submitted to this court and we have had oral argument and reargument here.

Miss Breckwoldt died on April 11, 1954 at the age of 89. Two brothers, who also never married, predeceased her, one in 1918 and the other in 1930. The brothers and sister resided in Hoboken where the brothers conducted a hardware store business and prospered. When the second brother, William, died in 1930 Miss Breckwoldt, then 65 years of age, inherited a fortune in excess of $450,000. Now alone, she employed as a companion the nurse, Patience Libby, who attended William in his last illness, and the two ladies thereafter lived together in Hoboken until 1950, and from 1950 until Miss Breckwoldt's death, in a small five room bungalow in Dumont, Bergen County, purchased in that year.

Respondent practiced in Hoboken for many years until 1938. From 1934 to 1938 he practiced in partnership with William A. Kaufmann in the firm of Herr & Kaufmann.

Respondent was William Breckwoldt's attorney. After William's death he became Miss Breckwoldt's attorney, first handling the administration of William's will under which Miss Breckwoldt was executrix and then becoming her advisor and confidant in the investment and management of her newly inherited fortune. Miss Breckwoldt had no training or experience adequate for the purpose; the record discloses that the extent of her business experience was occasional waiting on customers in the hardware store.

On October 1, 1937, at the instance of respondent, Miss Breckwoldt executed a "voluntary living trust" naming respondent as sole trustee. The agreement was not drawn in the office of Herr & Kaufmann. Respondent employed for the purpose, at Miss Breckwoldt's expense, Emerson A. Tschupp, a member of the New Jersey bar, formerly an employee of respondent and the firm. Mr. Tschupp did not consult with Miss Breckwoldt as to the terms of the agreement but received his instructions in that regard from the respondent. The instrument was typed by a public stenog-

rapher and was executed at Miss Breckwoldt's home at night in the presence of respondent, Mr. Tschupp, and a secretary formerly employed by Herr & Kaufmann.

The agreement transferred Miss Breckwoldt's fortune to respondent in trust and granted him very broad powers of management. He was authorized to make investments "as he in his absolute discretion shall or may deem proper or suitable * * * without restriction to that class of investments which a trustee is or may hereafter be permitted by law to make to the end that the principal hereof shall be increased to the greatest possible extent consistent, in the judgment of the trustee, with reasonable safety to the principal"; he could "retain by way of investment any property or securities by this indenture transferred to him, or the altered form thereof, without liability for depreciation, nor shall the trustee or his successors be liable for any errors in judgment in the making and retaining of investments"; he was authorized to cause securities to be registered "in his name as Trustee hereunder, in his name individually, or to take and keep the same unregistered," to "determine whether or not money or property coming into his possession shall be treated as principal or income, and to charge and apportion expenses or losses to principal or income, according as he may deem just and equitable;" and generally "to do, take, and perform all such acts and things as may be necessary and proper in furtherance of the execution of the foregoing power, and the preservation and management of said trust property, * * * as he may consider requisite and advantageous to the best interest of the estate."

The trust could be altered or revoked by written instrument or by Miss Breckwoldt's last will and testament, the donor reserving in either case the power to direct the disposition of the trust fund. The net income was payable to Miss Breckwoldt after deduction of commissions of 5% per annum and expenses, including an annual counsel fee of $500 to the respondent. She was also entitled to draw such amounts of principal as she might desire. A commission of 5% of the principal was also provided for respondent, payable

upon termination of the trust or upon the resignation or removal of the respondent as Trustee.

Mention should also be made of an earlier draft of the trust agreement. That draft included a provision not found in the final draft, empowering the respondent to name his successor in the event respondent resigned, became disqualified, was incapacitated, or died before termination of the trust; and that draft was accompanied by the draft of a will which named respondent as residuary legatee, subject however to the requirement "that he first apply so much of this gift, in such manner as to him shall seem most suitable and proper, so far as he is then able, to the uses and purposes as directed by me and with which he is already familiar, which for reasons by me deemed good and sufficient are not here expressed being the subject of previous agreement between us and confirmed and ratified by him at the time of the execution hereof; he to retain the balance, if any there be, after the employment and payment of the fund or portion thereof as herein directed, for his own proper use, benefit and enjoyment, in recognition of his long and conscientious service as advisor and counselor to my deceased brothers, William and Herman Breckwoldt and to myself."

Only unexecuted copies of these drafts were in evidence. Respondent's law partner at the time, Kaufmann, testified that he saw the originals fully executed on respondent's desk, but if the originals were in fact executed it is clear that they were not considered or treated as operative. Miss Breckwoldt did execute a will at a later date, April 29, 1940. That will was drafted by respondent. He had quit the practice of law two years earlier to devote his time to the office of Advisory Master in the former Court of Chancery, hearing matrimonial matters. The will was drafted in his chambers in Elizabeth.

The will named respondent as sole executor and trustee and granted him broad powers of administration comparable to those contained in the trust agreement. After providing a legacy of $15,000 for Patience Libby, and legacies aggregating $9,000 to three friends, the will bequeathed the residuary estate to the respondent with power in his "absolute

discretion" to pay out income or principal "as my trustee shall see fit to distribute" "to any one or more" of five named charitable organizations "without any obligation to account for the reasons which may actuate him to make such payment or payments"; "to appoint by his last will and testament or by suitable deed, the disposition of the *corpus* of my estate among the said charities or some or one of them, such choice to be made in his absolute discretion as aforesaid." He was also empowered to appoint a successor trustee, any successor to have all the powers and duties granted to him. Provision was made for compensation of $1,000 per year from the income or 5% of the gross income, whichever was the lesser, and for a commission of 5% of all assets distributed by him; there was a like provision for compensation to any successor he might name.

It will be noted that no provision was made either in the trust agreement or in the last will and testament for heirs at law or next of kin. Miss Breckwoldt was not on close or friendly terms with her few relatives who lived at distant places. In 1943, 11 years before her death, next of kin retained Arthur Gould, a New York attorney, to investigate into Miss Breckwoldt's affairs. Gould was a law school classmate of Kaufmann's and sought information from Kaufmann. Kaufmann supplied information to Gould, which if true, cast grave doubt upon Miss Breckwoldt's mental capacity when the trust was created and reflected adversely upon respondent's conduct in having Miss Breckwoldt execute the instrument.

Gould made no use of the information until after Miss Breckwoldt's death, when he retained New Jersey counsel to contest the probate of her will on grounds of lack of testamentary capacity and undue influence. The proceeding pended before Judge Grimshaw in the Chancery Division. The contest was not pressed after a settlement was made and the sum of $110,000 paid out of the estate to and on behalf of the heirs at law and next of kin. Before settlement was reached, Kaufmann's deposition was taken at the instance of counsel representing respondent. That deposition

was directed to this court by Judge Grimshaw, and after reviewing it we directed Judge Grimshaw to conduct an inquiry into its subject matter and generally into respondent's conduct in his relations with Miss Breckwoldt and in his management of the trust. Voluminous testimony was taken and many exhibits were received in evidence. Two reports were filed by Judge Grimshaw. These reports resulted in the preferment of the charges now under consideration. By consent, the record made at the inquiry was made the record upon the hearings of the charges, supplemented with other testimony.

## I.

Kaufmann entered respondent's employ in 1930 after his admission to the bar, and the firm of Herr & Kaufmann was formed in 1934. Kaufmann's contacts with Miss Breckwoldt, according to his testimony covered the years from 1930 or 1931 to 1938. He said she was a frequent visitor at the office and that he often had occasion to interview her in connection with the execution of various papers. He said that in 1935 he began to suspect "that she had slipped pretty badly mentally." "Her memory became extremely bad," "she would come into the office several times to keep one appointment. She seemed to have lost concept of time. She did not seem to understand what was said, what she was doing." "If I would explain a document to her the only response I would get was one of blank stare, to me a look of lack of understanding." "As time went on, I would say into 1936 and 1937, she wore a continual insipid smile, the same expression such as you would find on a happy child of eight, nine or ten years."

Kaufmann further testified, although respondent categorically denies it, that he made known his concern to respondent as early as 1936 and "several times" thereafter, although not "in so many words," suggested her incompetency and argued "that there should be a guardianship proceeding or a guardian appointed for Miss Breckwoldt." Kaufmann

said that respondent rejected the idea and preferred to have "a trust as a means of solving that problem" and that finally, in April of 1938, when Kaufmann persisted respondent "made it very definite that he did not want me to bother him anymore about it. He brushed aside definitely, brusquely I would say, the idea of a guardian."

Before that 1938 discussion and after the execution of the trust agreement of October 1937, of which respondent had informed him, Kaufmann says he conceived the idea of having Miss Breckwoldt execute some nonsensical documents as evidence of her incapacity in order to persuade respondent to "abandon this trust business and have a guardianship." Respondent at that time had in his employ a lawyer, Bernard J. Kenny, not connected with the firm, who was writing the text of a work on marriage, divorce and separation subsequently published in respondent's name. Kaufmann enlisted the aid of Kenny to write the nonsensical documents and Kenny drafted four such documents which it is conceded bear Miss Breckwoldt's signature. They are dated respectively October 1, 1937 (the date of the trust agreement); December 22, 1937, December 24, 1937 and April 29, 1938. The nature of the documents is sufficiently shown by reproducing the one dated October 1, 1937.

"This is to let the world know that I am fully acquainted with all that goes on. Before proving that, I should not omit to state that I am whacky. In fact, so much so that when I am called screwy, I am being insulted. I'm as weak minded and as simple as any human being can be. I don't know one day from another, what I own or owe, who my relatives are, or any of the ordinary things that a normal person would know. Be that as it may, I persist in proving that I know all. There is an election taking place in New York City. Dewey is running for Mayor and LaGuardia for the D.A.'s job—I may have that confused, maybe it is LaGuardia for the D.A.'s job and Dewey for Mayor. I bet they'll lose or win. I hope they win and lose. No—I change my mind—I hope they lose and win. Are you convinced that I'm all right in the head? Why not—Anyhow I can read and write and to prove it here is my J. H. with all the trimmings."

Kaufmann testified that on each occasion that one of the nonsensical papers was signed, he alone interviewed Miss

Breckwoldt, first gave her the paper to read, and then himself read it aloud to her before she signed it.

But Kaufmann did not show any of the papers (called by the parties "the crazy quilts") to respondent nor tell him about them. He said he did not do so because when he talked with respondent in April 1938 "I had these with me and I wanted to tell Mr. Herr that it was obvious that this woman couldn't execute validly anything, but he would not speak to me. He was very angry with me and told me to mind my own business and to have no concern about the matter; that it was his own personal business." Respondent first learned of the "crazy quilts" when Kaufmann's deposition was taken.

## II.

Much of respondent's brief consists of a vigorous attack upon Kaufmann's credibility and upon his conduct in connection with the preparation and alleged execution of the "crazy quilts," and the methods employed by him to obtain surreptitiously other papers offered in evidence. Kaufmann's motives are impugned and the charge is levelled that he deliberately and maliciously concocted a plot unfairly to assail respondent's character, holding his fire until after Miss Breckwoldt's death.

But we cannot dismiss the charges of respondent's alleged abuse of his client's confidence merely by rejecting Kaufmann's testimony and refusing to draw the inference of Miss Breckwoldt's complete mental incapacity suggested by that testimony and by the "crazy quilts." There existed an unusually close relationship of attorney and client between respondent and Miss Brackwoldt and she trusted him implicitly. Respondent admits as much on his brief in saying that "unquestioned is the fact that Miss Breckwoldt had profound confidence in Mr. Herr, whom she had known for many years." It is this unquestioning confidence and trust, without regard to Miss Breckwoldt's age or capacity, which heightened the obligation of the respondent for punctilious

adherence to the high standards which measure an attorney's obligations to his clients.

██ Confidence so reposed has ever been sufficient reason, in equity, for requiring the recipient to accept the onus of proving *uberrima fides* when his conduct is called in question. This is a great and ancient maxim of equity, applicable to all variety of relations in which influence or dominion may be exercised by one person over another: "That great rule of court, that he who bargains in matter of advantage with a person placing confidence in him, is bound to show a reasonable use of that confidence; a rule applying to trustees, attorneys, or anyone else." *Gibson v. Jeyes*, 6 *Ves. Jr.* 266, 31 *Eng. Rep.* 1044 (*Ch.* 1801).

██ Is the attorney's position different when his conduct is called into question in a disciplinary proceeding? We think it is not, at least when the court is satisfied with reasonable certainty, as is the case here, that a *prima facie* case of disciplinary misconduct has been made out against the attorney. In such a case, the decisions uniformly hold that the burden of overcoming such *prima facie* case by evidence rests on the attorney. See 7 *C. J. S., Attorney & Client*, § 33, *p.* 781, where the following cases are cited: *In re Graves*, 64 *Cal. App.* 176, 221 *P.* 411 (*D. Cl. App.* 1923); *In re Horovitz*, 228 *App. Div.* 484, 240 *N. Y. S.* 343 (*App. Div.* 1930); *In re Fieldsteel*, 228 *App. Div.* 470, 240 *N. Y. S.* 481 (*App. Div.* 1930); *In re Kunstler*, 248 *App. Div.* 393, 289 *N. Y. S.* 107 (*App. Div.* 1936); *In re Salus*, 321 *Pa.* 106, 184 *A.* 70 (*Sup. Ct.* 1936); *In re Gery*, 284 *Pa.* 121, 130 *A.* 307 (*Sup. Ct.* 1925); *People ex rel. Attorney-General v. Laska*, 105 *Colo.* 426, 101 *P.* 2d 33 (*Sup. Ct.* 1940); *In re Lenox*, 371 *Ill.* 505, 21 *N. E.* 2d 721 (*Sup. Ct.* 1939); *In re Melnick*, 383 *Ill.* 200, 48 *N. E.* 2d 935 (*Sup. Ct.* 1943). As it is abhorrent to the law and our ethical code that an attorney should derive a benefit to himself from the misuse of the confidence arising from the attorney-client relation, "where from the attendant circumstance there is a reason to presume that the attorney possessed some marked influence, ascendancy or other advantage over

his client * * *" the law supersedes the necessity of any inquiry into the particular means, extent and exertion of influence in a given case; a task often difficult, and ill supported. by evidence which can be drawn from any satisfactory sources." 1 *Story on Equity Jurisprudence* (14*th ed.* 1918), *sec.* 433. Thus, the court being satisfied with reasonable certainty that a *prima facie* case of abuse in violation of Canon 11, by an attorney of a client's confidence for his personal profit or gain has been made out, it is right and just to require that the attorney shall prove either that no advantage of his client was taken or that the advantage received was received without a speck of imposition on his part and was the result of a well considered, definite and settled purpose on the part of the client. In this way substance and meaning are given to the high principles of conduct self imposed by our profession and eloquently articulated over a century ago by Mr. Justice Nelson speaking for the United States Supreme Court in *Stockton v. Ford,* 11 *How.* 232, 52 *U. S.* 232, 247, 13 *L. Ed.* 676 (1850), where he said:

"There are few of the business relations in life involving a higher trust and confidence than that of attorney and client, or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it."

We observe, too, that the effort to get the full details of transactions between Miss Breckwoldt and the respondent, individually and as her trustee, was seriously handicapped by the paucity of his records and the inadequacy of such records as he did maintain. It was difficult, for example, to trace checks out of or into Miss Breckwoldt's personal checking account (she maintained only. one after the trust was established, first with a Hoboken Bank and after her move to Dumont, with a bank there) because all her cancelled checks and statements, admittedly mailed by the

banks to the respondent and not to Miss Breckwoldt, had disappeared. Even checks drawn by him as trustee could not be produced for several years. And the tracing of his receipts and disbursements, the precise determination of the income and principal received on investments and other pertinent matter concerning his investment transactions was difficult because he could produce no cash receipts and disbursement book, no general journal and no general or subsidiary ledgers, records, the maintenance of which, according to one of his own expert accountant witnesses, was required by standard accounting practice for a trust of this character. The voluminous records of securities transactions and annual statements prepared by his accountant, one Steinel, were entirely inadequate substitutes for proper records. It is the duty of a trustee to the beneficiaries of the trust to keep clear and adequate records and accounts. 2 *Scott on Trusts* (*2d ed.* 1956), *sec. 172, p.* 1287. And when he fails to keep proper accounts, all doubts or obscurities are resolved against him and not in his favor. *Smith v. Robinson,* 83 *N. J. Eq.* 384 (*Ch.* 1914); *Dufford v. Smith,* 46 *N. J. Eq.* 216 (*Ch.* 1889); *Willis v. Clymer,* 66 *N. J. Eq.* 284 (*Ch.* 1904); *United Towns Bldg. & Loan Ass'n v. Schmid,* 23 *N. J. Super.* 239 (*Ch. Div.* 1952); *Restatement on Trusts, secs.* 172, 173.

To complete the perspective of respondent's relations to Miss Breckwoldt, we should return to the evidence of respondent's own witnesses in describing her. Their evidence pictures her to be a person, though fully possessed of her faculties, who would by nature be inclined to have unquestioned trust in one in whom she had confidence and for that reason was more than ordinarily vulnerable to the hazard of having her trust betrayed. The scrivener of the trust agreement, Mr. Tschupp, said as much in testifying that from background and nationality, this gentle, elderly lady of German extraction, residing with her brothers until the death of William when she was 65, was of the sort "who know their place" and are accustomed to accept on faith the guidance of trusted menfolk. And from the time of William's death

until her own 24 years later, she lived a quiet, frugal and somewhat cloistered life. She and Miss Libby took trips to Florida, Bermuda or New England on several, perhaps many, occasions during the 1930's and 1940's, but she rarely left Dumont after moving to the small bungalow there in 1950. She had a small circle of friends, ladies of her own generation, and occasionally entertained or was entertained by them, but never pretentiously. She read German and English language newspapers, was close-mouthed, even with Miss Libby, about her property and means, and definitely was not worldly in financial or business matters.

It was doubtless a natural thing for such a gentle, relatively unworldly person, upon coming into a large fortune at the age of 65, to turn to a trusted advisor for help to relieve her of its care and responsibility. Respondent had long been William's attorney, was her own in winding up William's estate, and was the obvious choice.

One of the troublesome aspects of this case is why respondent had Miss Breckwoldt create the trust, when he already was actively managing all her property, even to keeping her check book at his office and preparing her checks for her signature, and why when he did, it was done secretively: prepared not at his office or by a lawyer of his firm but by a former employee who took his instructions not from Miss Breckwoldt (Tschupp never saw or talked with her about the contents of the agreement), typed by a public stenographer and executed at night at Miss Breckwoldt's home in the presence of only himself, the scrivener and another former employee. This conduct suggests that the virtual complete control of her property given to respondent by the agreement was purposed to put him in a position to control the property for his own advantage. That suggestion is not satisfactorily dispelled by his explanation that he did what his client wanted him to do and did it in the way he did because the scrivener and other employee had been discharged by Kaufmann and he kept the matter out of the office to avoid reopening those controversies. Indeed, the suggestion acquires the force of a strong inference that control for his own ad-

vantage was the true motive, when the event is considered in the light of the proofs concerning certain substantial sums of money borrowed by respondent from Miss Breckwoldt, one after and the other before the creation of the trust, and when considered also, in the light of the things he did during the seventeen years of the existence of the trust. We turn now to the discussion of such matters.

### III.

Charge 3 (I) is that "The said Herr paid over to himself the sum of $15,000 as a loan which loan was not repaid."

This charge was based upon respondent's admission that in the Spring of 1938, several months after the trust was created, and in Miss Breckwoldt's 73rd year, he needed money to finance the publication of his book, and for the purpose borrowed monies from Miss Breckwoldt in varying amounts over several months. The only bank account maintained by Miss Breckwoldt at the time was a personal checking account at the Seaboard Trust Company, Hoboken, now defunct. None of the cancelled checks or bank statements relating to that account was produced. The bank was able, however, to produce a transcript of the account for the period from January 15, 1938 to June 10, 1940. A check bearing date May 12, 1938 for $4,000 in respondent's handwriting, but signed by Miss Breckwoldt, was also produced and respondent identified it as the first of the advances. The check was deposited in his personal account at the Caldwell National Bank. There are no checks for the further advances and respondent could not say "how much altogether" they totalled, but "might be" from $10,000 to $15,000. The transcript, however, discloses withdrawals on July 20, 1938, October 1, 1938 and November 15, 1938 of $6,000, $5,000, and $7,500, respectively. We may reasonably conclude that in the absence of more definite testimony from respondent the sums mentioned are the advances in question.

Respondent says that these were "temporary loans" to be paid back, and that they were in fact paid back by checks of his brother-in-law payable to his order and endorsed and

delivered by him to Miss Breckwoldt. He was also emphatic that "This money she let me have was not a part of the trust. It was her own money which was not in the trust at all."

We digress to say that at the court's request at the original oral argument, respondent had his accountant, Steinel, prepare a statement detailing the payments of trust monies claimed to have been made to Miss Breckwoldt over the life of the trust. We also asked that the cancelled checks evidencing such payments be produced and filed. It was reported that the checks for several years could not be located but the checks for the year 1938 were supplied. They are a check for $7,500 dated September 27, 1938, a check for $4,000 dated November 10, 1938, and a check for $500 dated December 2, 1938. All were deposited in Miss Breckwoldt's personal account on or about the dates they bear.

Examination of the transcript of the account shows that these deposits of trust monies and 11 other deposits of trust monies in the ensuing period ending June 10, 1940 were the only deposits made to the account from and after September 28, 1938. The transcript also discloses that the deposits of $7,500 and $4,000 were necessary to bring the account balance to sufficient amount to permit of the withdrawals of $5,000 on October 1 and $7,500 on November 15 advanced to the respondent.

From the fact that respondent produced no proof except his own testimony that the loans were repaid by his brother-in-law's checks, and from the further fact that the transcript of the only account then maintained by Miss Breckwoldt shows the only deposits therein to be deposits of trust monies, we are compelled to conclude both that a substantial part of the advances to respondent were of trust monies, though indirectly through Miss Breckwoldt's account, and further, that no part of the loans were in fact repaid by respondent.

## IV.

Charge 1 is that "The said Herr, while acting as attorney of Bertha Breckwoldt in the year 1937, appropriated to his

own use property of the said Breckwoldt amounting to $80,000."

We agree with Judge Grimshaw that there was no proof sufficient to establish a *prima facie* case as to this charge except the proof concerning a certain note of respondent and two others evidencing monies owed Miss Breckwoldt on December 31, 1936 in the amount of $26,660.95. Before the trust was created on the following October 1, $5,000 was paid on account. When the schedule of trust assets was prepared by Steinel for respondent he included the note in its reduced balance, but deleted it upon receipt of a memorandum from respondent that the "note * * * has been cancelled and should be omitted." There was much expert accounting testimony as to what happened to the note, but none of the accountants could find any trace of it or of its proceeds among Miss Breckwoldt's assets. There was evidence that as early as May 1937 respondent was substituted for Miss Breckwoldt as the creditor of his co-obligors. Respondent acknowledges this on his brief and also that "The fact still remains that the respondent was unable to produce proof of his payment to Miss Breckwoldt" contending, however, that this "inability should not militate against his claim of payment in the face of the long efflux of time during which papers could well be lost, misplaced or even purloined."

We find difficulties with respondent's argument. If so large a sum was in fact paid to Miss Breckwoldt in the nine months from December 31, 1936 to October 1, 1937, it is natural to suppose that her bank accounts would reflect the deposit of some comparable sum. But a comparison of the amounts on deposit in the several savings accounts she maintained at the end of 1936 with the amounts testified to by the several bank witnesses as being withdrawn therefrom before October 1, 1937 discloses nothing to account for such a sum, and her bank balance at January 15, 1938 (the proceeds of the savings bank deposits had been deposited in that account) was not sufficient to reflect such a payment. Respondent points out on his brief that the proceeds of a

foreclosure sale of one of the mortgaged properties securing the note, $5,233, was deposited by respondent in his trust account in 1944. We fail to see how this proves payment of the note in 1937 or is any evidence, as suggested, apparently for the first time on the brief, that at least all but $5,000 had been paid off in 1937, the deposit in 1944 "thus paying off in full the balance of the note with interest."

We conclude upon this item that no part of the loan was in fact repaid to Miss Breckwoldt by the respondent.

## V.

Charge 3 (F) is as follows:

"The said Herr appropriated to himself a large sum of money, the exact amount of which cannot be stated due to the manner in which it was done, which was for the said Herr to issue a check to the order of the said Breckwoldt, which check was delivered to Garrison Herr, who obtained the endorsement of the said Breckwoldt, cashed the check himself, and obtained the money. Approximately $287,558.41 was drawn out of the trust estate by the said Herr with no proof of payment to the said Breckwoldt."

Respondent submitted a statement indicating that over the life of the trust, gross income from dividends, interest and capital gains was $541,733.83. Deductions for administration expenses and federal income taxes amounted to $183,034.89. The balance available for distribution was thus $358,698.94. Respondent says he distributed to Miss Breckwoldt or paid for her account a total of $295,569.79.

The court at the first oral argument called for the details of the payments to Miss Breckwoldt and for her account, including the checks or vouchers evidencing such payments. A statement breaking down the payments prepared by the accountant, Steinel, trustee's checks for the years 1937 to 1945 and from 1950 to 1954 (checks from 1946 to 1949 inclusive and some other checks were said to be missing), and a letter of Steinel's were submitted. The letter stated that in the time allowed for the purpose only $270,687.52 of the total of $295,569.79 said to have been paid to Miss

Breckwoldt or for her account could be documented either from checks, stubs in respondent's check books, or work sheets. After an adjustment of $1,988.62 erroneously charged as a payment to Miss Breckwoldt, although actually paid on account of federal income taxes, this left about $25,000 undocumented. Steinel's letter states, "There are a sizeable number of checks and stub entries which I could not with confidence identify and classify at this time as additional items to go into the B. B. (Bertha Breckwoldt) withdrawals computation."

The difficulty in this instance in supplying an adequate accounting is illustrative of the doubts and obscurities arising from respondent's failure of duty to keep proper records.

But of more moment is the difficulty of reconciling Miss Breckwoldt's scale of living with the receipt of the large sums which it is claimed were paid to her *in cash* over the years. Steinel's incomplete figures total these at $230,913, which averages over $16,000 a year. No income taxes were payable on these sums and they were additional to amounts paid directly by respondent for Miss Breckwoldt's account.

She and Miss Libby lived in a cold-water flat rented at $40 a month while they lived in Hoboken. That rent was not paid by her but directly to the landlord by the respondent, who also paid the electric light and gas bills averaging from $7 to $9 a month. In addition, respondent paid the railroad and other expenses of trips, usually to Florida, which Miss Breckwoldt and Miss Libby took during the 1930's and 1940's. Items of furniture, including a range and washer, a television set, linens and the like were also paid for by him with his trustee's check.

After the ladies moved in 1950 to the bungalow in Dumont (it was valued at $12,000 and the furniture therein at $50 in respondent's inheritance tax return), respondent's checks paid the purchase price $12,814.71 and expenses for fuel oil, real estate taxes, insurance, furniture, water bills, repairs and a number of other sundry items amounting before her death to an aggregate of almost $10,000, according to Steinel's figures.

The only identifiable major expense paid by Miss Breckwoldt was Miss Libby's salary. This was $50 a week while the ladies lived in Hoboken, and $75 a week after they moved to Dumont. Respondent apparently also relieved her of at least part of that expense after 1952, since Steinel's statement lists payments to Miss Libby for salary in 1952, 1953 and 1954 aggregating $3,450.

But despite the certainty that the ordinary household, clothing and food expenses necessary to maintain her modest scale of living could not conceivably account for the expenditure, and although the evidence as to her habits with money squarely opposes the conclusion, we are asked to believe that Miss Breckwoldt somehow disposed annually of cash in the amount of $16,000. Nothing remained at her death of the aggregate of at least $230,000 which she is said to have received, in cash, except $5,250. Respondent testified that this sum was found by him and his son, Garrison Herr, in a trunk in the attic of the bungalow. It is conceded, however, that this sum, assuming it was found in the trunk, as testified, would doubtless be what was left of $5,500 in cash which respondent says was given to her about two months before her death to make a gift to some unidentified friend.

The inferences adverse to respondent's position become particularly disturbing when considered in the light of the unorthodox and highly unusual method employed by respondent to get the cash to Miss Breckwoldt. As already mentioned, he maintained her personal check book at his office. Two or three times a month, from 1938 to 1954, he prepared a trustee's check, most often in the amount of $500 but frequently for $1,000 or $1,500, and simultaneously prepared a check in the like amount on Miss Breckwoldt's personal account. Both checks were taken by his son, Garrison Herr, also a member of the New Jersey bar, to Miss Breckwoldt's home. The trustee's check was endorsed for deposit to Miss Breckwoldt's account and her signature was obtained on her personal check. Garrison then took both checks to the bank where Miss Breckwoldt maintained her account, first in

Hoboken and latterly in Dumont, deposited the trustee's check and cashed Miss Breckwoldt's check. Garrison testified he then returned to Miss Breckwoldt's home and delivered the cash to her.

The prosecutor of the charges was able to secure Recordak reproductions of Miss Breckwoldt's checks cashed at the Dumont bank, and a like reproduction of the transcript of her account. The original cancelled checks and statements were mailed to respondent who said they were forwarded to Miss Breckwoldt after being examined by the accountant, Steinel. No statement or cancelled check of any kind was found among Miss Breckwoldt's effects. The bank continued to send statements to respondent after Miss Breckwoldt's death but respondent was not able to say what happened to them.

The transcript of the account shows that in the 48 months from April 3, 1950 when the first deposit was made to March 24, 1954, the date of the last deposit, total deposits were $70,700, or approximately $1,500 per month. These were entirely deposits of trust funds, as is confirmed by Steinel's statement and respondent's cancelled checks. There were 121 deposits in all, 113 of which were in the amount of $500. There were three $1,000 deposits, two of $1,500, one of $1,200, one of $5,000, and one of $702. The deposits were at the rate of three each month.

There were 119 withdrawals, with few exceptions each made simultaneously with a deposit and in the same amount. The cashed checks often bore the endorsement of Garrison Herr, and at least one of them the endorsement of the respondent. Withdrawals aggregated $70,200, leaving a balance at Miss Breckwoldt's death of $500.

Miss Breckwoldt lived in Dumont from her 85th to her 89th year. Miss Libbey's evidence attests that her advanced age materially curtailed her always simple activities. We find it impossible to accept respondent's argument that this lady of advanced age, whose major expenses were being met from other trust funds, somehow disposed of the large sum of $65,000 during that period.

Respondent insisted that any responsibility or fault was solely his and was not to be charged to his son. Not only has he failed satisfactorily to prove that he paid Miss Breckwoldt the money, but the strong inferences from the circumstances is that he gained a substantial part of them for himself and that inference stands unrebutted.

## VI.

In administering the trust estate he has committed the unpardonable sin for all fiduciaries, and more unpardonable for the attorney-fiduciary, of co-mingling the funds of the *inter vivos* trust estate with funds of his own in an account designated "Special." Herr's secretary had power of withdrawal on this account. These facts were simply denied by the respondent without in any way corroborating his position in this most important charge against him.

## VII.

Informality permeated all of the respondent's dealings with respect to Miss Breckwoldt's property. He casually treated the trust funds as if they were his own. He sold and liquidated the property under his control and with the proceeds embarked upon a most inconceivable plan for a trustee of purchasing highly speculative securities. So speculative were they, that in the portfolio at the time of the hearings before Judge Grimshaw none of the "securities" had a rating better than "C" and some were so speculative that they had no rating at all.

The respondent freely discussed the terms of Miss Breckwoldt's will, during her lifetime, with a "stockbroker" used by him in the making of these questionable "investments." It was frankly admitted that both the "broker" and the respondent were more interested in capital gains, not so as to benefit Miss Breckwoldt during her lifetime, but to favor the ultimate remaindermen who were not interested in the trust instrument but only ultimately under the will, and then only subject to the most unusual powers granted to the respondent.

## VIII.

The respondent advanced more than $100,000 of trust moneys to a venture known as the "South Plainfield Airport" in which he became involved in 1949 with a man named Decker. At the time of Miss Breckwoldt's death in 1954 more than $84,000 was due to the trust from this venture, secured by notes which were antedated when made and all in default at the present time. Nothing was offered to justify the airport transaction. On one occasion when money became available from the venture, the existing notes then $86,000 were not liquidated. After the payment of the interest only on these notes more than $18,000 was split between the Herr and Decker interests—the Decker payment was described as a "return on investment"; the Herr payment went to the respondent's son and his law partner as "counsel fees."

### CONCLUSION.

There is little or no direct evidence to show that the respondent stole or appropriated money or property to his own use, save as this appears in regard to the moneys he borrowed and did not pay back, but there are so many questionable facts and suspicious circumstances making up a *prima facie* case that required his affirmative answer, which in turn was not given in discharge of that burden, that we are led to the only irresistible conclusion—they cannot be satisfactorily explained away. If the respondent, an intelligent practitioner of long standing, a former member of the judiciary, put himself in that position, he has but himself to blame for his plight. *Liberty Title & Trust Co. v. Plews,* 6 *N. J.* 28, 39 (1950); *Bolle v. Rainville,* 138 *N. J. Eq.* 508, 514 (*E. & A.* 1946).

It is urged on behalf of the respondent that no presumption of any undue influence on his part is created merely because he was named as trustee of the trust and as a similar fiduciary under the will, both of which were prepared by him, that the constructive fraud principle applicable in cases where an attorney is made a beneficiary of a will

or trust which is prepared or supervised by himself has no pertinency here because the respondent obtains no beneficial interest under either document other than the fees and commissions for which he works. But while the respondent is not named as a *cestui* under the trust or as a legatee or devisee under the will of Miss Breckwoldt, the powers granted to him are so complete and the discretion given him so absolute that his position is tantamount to that of a beneficiary. Further, he has treated the funds as his own without regard to his obligation to his donor or her charitable beneficiaries. There is every indication that this respondent had insured to himself the control of this estate even beyond his own lifetime. He put himself into a superior bargaining position as far as the ultimate beneficiaries are concerned, so that it would not be practical for any of them to contest his actions because in the exercise of his absolute discretion he had the power to "cut them off." We can gain but a hint of his purpose from the earlier will under which the respondent made himself a principal beneficiary of Miss Breckwoldt's bounty. A confidential relationship such as existed here between the respondent and Miss Breckwoldt, plus the existence of suspicious circumstances constituting a strong *prima facie* case of misconduct, is enough to cast the burden on to the respondent to show by impeccably clear and convincing proof his freedom from fraudulent and unduly influential conduct. *In re Blake's Will,* 21 *N. J.* 50 (1956); *In re Rittenhouse's Will,* 19 *N. J.* 376 (1955). He has not come close to carrying that burden.

There is also the claim that the respondent did nothing more with the assets by way of investment than he was authorized to do under the trust. He says that the desire was always to increase the principal for the benefit of the remainderman. But what the respondent refuses to recognize is that this purpose could only be carried out "with reasonable safety to the principal," and this direction he most definitely violated.

There is nothing wrong in an attorney accepting the confidence of a client and in managing his property and

estate if the client of his own free and unfettered will desires to place such a trust in an attorney. But such a situation is fraught with danger for the attorney. The only way in which he can protect himself is through scrupulously proper conduct, not only in the manner in which he deals with the property but in the documentation of his actions. Only by being able to show clearly each and every one of his transactions no matter how long the period of time can he insure himself of being above reproach. It is not enough for him to say "I have acted properly in the performance of my trust." He must prove it. Here the respondent's reckless treatment of the funds committed to his care, his self-dealing, his failures to pay back the large sums he borrowed, the highly suspicious manner in which he permitted payments to be made to Miss Breckwoldt, the disappearance of her bank account records committed to his care, and his lack of candidness compel the conclusion that in the several particulars discussed he abused and took advantage of, for his personal profit and gain, the trust and confidence reposed in him by Miss Breckwoldt.

There is no profession, save perhaps the ministry, in which the highest morality is more necessary than that of the law. *Sharswood, Essay on Professional Ethics* (1896), *p.* 55. "There is in fact, no vocation in life where moral character counts for so much or where it is subjected to more crucial tests by citizen and the public than is that of members of the bar. * * * The fidelity and candor with which he performs his trust, point up reasons that distinguish the legal profession from other businesses." *State ex rel. Florida Bar v. Murrell, Fla.,* 74 *So.* 2d 221, 224 (*Sup. Ct.* 1954).

It has been very aptly said that there is no profession apart from the legal profession where there is greater disparity between true character and reputation. The fault lies in the lack of understanding by the public principally provoked by the transgressors among us—not so much by the flagrant violators, because the public is quick to appreciate the inevitableness of their existence, but by those members

who by unconscionable conduct tip the delicate balance in which trust and confidence in a lawyer's actions hangs; not so much by malefactions which are branded criminal but by those that are in the twilight zone of low morality.

We discipline not to punish but to. purify the bar, to increase its reputation and to protect the public and the courts from fraud and imposition. *In re Breidt,* 84 *N. J. Eq.* 222 (*Ch.* 1915).

It is the judgment of the court that the respondent was guilty of violating Canon 11 in the ways described.

The discipline imposed is that the respondent be disbarred.

WACHENFELD, J. (dissenting). An emergency demanding the hasty dictation and submission of this dissent prevents an exhaustive analysis of the lengthy record presented. Suffice it to say that the scrutiny made in the consideration of this matter showed no such flagrant violations as found by the majority.

The main witness against the respondent was William A. Kaufmann. The record reveals his credibility was entirely destroyed and not accepted by any one.

Miss Breckwoldt retained considerable acumen and mental poise to the day of her death. For 17 years she had been satisfied with the services rendered by the respondent and never once had she complained about the establishment or the maintenance of the trust, although she was cognizant and had full knowledge of it. And after she departed, the beneficiaries under the testamentary trust, which predominantly consisted of the assets of the *inter vivos* trust, expressed themselves as completely satisfied with the administration of both trusts and the handling of funds, and opposed Herr's removal as testamentary trustee and executor. As to the *inter vivos* trust, if there were any unorthodox investments, they were sanctioned by the instrument itself, and the income obtained therefrom was segregated in the account designated "Dougal Herr Special." There. was neither fraud nor negligence on the respondent's part in the disbursal of trust funds to Miss Breckwoldt, and certainly

302 

there is no evidence substantiating a finding of blatant misappropriation.

There were certain gaps in Herr's records, but some were caused because bank photostats had been destroyed, which Herr, of course, could not anticipate. There were sufficient records remaining to make possible a summary account of the trust transactions. Furthermore, an accountant, a witness for the court, was able to ascertain the total sales and purchases of securities made by the trust from the records furnished by the respondent. If there were minor transgressions, they appear to be the result of carelessness and inattention rather than corrupt conduct.

The respondent was confronted with a multitude of accusations based on his activities over a period of eighteen years. Some of these, apparently dubious in light of hindsight, might readily have been explained with the facts and figures at the time they took place or during any reasonable period thereafter.

The respondent is now 75 years of age and has practiced at the bar for 50 years with distinction, having been a member of the judiciary. He was humiliated and depressed by publicity concerning the aftermath of an unfortunate matrimonial venture, destroying the pride he once possessed as an authority in the field of domestic relations. He is mentally and physically impaired to a degree where he no longer possesses the mind or the body to permit him to adequately defend himself against the charges made.

In *In re Frankel*, 20 *N. J.* 588, 597 (1956), this court said:

> "The disciplinary discretion is to be reasonably exercised, 'with moderation and caution,' controlled by the basic consideration that the object is not punishment of the offender, but rather the disqualification in the public interest of a practitioner of the law who has been guilty of 'misconduct, indicative of moral unfitness for the profession * * *.' "

In this instance the public needs no further protection. Nature has amply and permanently provided it. Herr is largely incapacitated mentally and physically and unable to

practice law or any other useful occupation. He has left the jurisdiction, seeking elsewhere some modicum of comfort and consolation. The devastation wrought by his misfortunes is best reflected in his attempted suicide and the note he left revealing his pathetic appraisal of continued worldly existence.

The majority conclusions, according to my view, come more within the classification of punishment of the respondent than public protection, and I cannot, on the record before me, vote to block out the few days of dim sunshine which still remain for him.

I would discharge the rule.

HEHER and OLIPHANT, JJ., join in this dissent.

*For disbarment*—Chief Justice VANDERBILT, and Justices BURLING, JACOBS and BRENNAN—4.

*For discharge of rule*—Justices HEHER, OLIPHANT and WACHENFELD—3.